IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SUMMIT DATA SYSTEMS, LLC,

      Plaintiff,

    v.

EMC CORPORATION, BUFFALO
TECHNOLOGY (USA), INC., D-LINK
SYSTEMS, INC., HITACHI DATA
SYSTEMS CORPORATION,
INFORTREND CORPORATION,
NETAPP, INC., NETGEAR INC., and
QNAP, INC.,

      Defendants.

Civil Action No. 10-CV-749-GMS

JURY TRIAL DEMANDED

## SECOND AMENDED COMPLAINT

Plaintiff Summit Data Systems, LLC ("Summit Data") files this its Second Amended Complaint against Defendants showing this Court as follows.

### Nature of the Action

1.    This is an action for patent infringement, arising out of Defendants' infringement of U.S. Pat. No. 7,392,291, issued on June 24, 2008, and entitled "Architecture for Providing Block-Level Access over a Computer Network" (the "'291 Patent") and U.S. Pat. No. 7,428,581, issued on September 23, 2008, and also entitled "Architecture for Providing Block-Level Access over a Computer Network" (the "'581 Patent"). True and correct copies of the '291 Patent and '581 Patent are attached hereto as Exhibits A and B, respectively.

### The Parties

2.    Plaintiff is a limited liability company, organized and existing under the laws of the state of Texas, with its principal place of business also in the state of Texas.

3.     Upon information and belief, Defendant EMC Corporation ("EMC") is a corporation organized and existing under the laws of the state of Delaware.  EMC's registered agent for service of process is Corporation Service Company, 2711 Centerville Road, Suite 400, Newcastle, Delaware 19808.  Upon information and belief, EMC does business in the state of Delaware by, among other things, offering for sale and selling the EMC Products, as defined below, within the state of Delaware.

4.     Upon information and belief, Defendant Buffalo Technology (USA), Inc. ("Buffalo") is a corporation organized and existing under the laws of the state of Delaware. Buffalo's registered agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  Upon information and belief, Buffalo does business in the state of Delaware by, among other things, offering for sale and selling the Buffalo Products, as defined below, within the state of Delaware.

5.     Upon information and belief, Defendant D-Link Systems, Incorporated ("D-Link") is a corporation organized and existing under the laws of the state of California.  Upon information and belief, D-Link's registered agent for service of process is Ms. Nancy Lemm, 17595 Mt. Hermann Street, Fountain Valley, California 92708.  Upon information and belief, D-Link has offered for sale and/or sold the D-Link Products, as defined below, within the state of Delaware.

6.     Upon information and belief, Defendant Hitachi Data Systems Corporation ("Hitachi") is a corporation organized and existing under the laws of the state of Delaware. Hitachi's registered agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  Upon information and belief,

Hitachi does business in the state of Delaware by, among other things, offering for sale and selling the Hitachi Products, as defined below, within the state of Delaware.

7.      Upon information and belief, Defendant Infortend Corporation ("Infortrend") is a corporation organized and existing under the laws of the state of California.  Upon information and belief, Infortrend's registered agent for service of process is Mr. Tony Chu, 2200 Zanker Road, #130, San Jose, California 95131.  Upon information and belief, Infortrend has offered for sale and/or sold the Infortrend Products (as defined below) within the state of Delaware.

8.      Upon information and belief, Defendant Netapp, Inc.("Netapp") is a corporation organized and existing under the laws of the state of Delaware.  Netapp's registered agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Upon information and belief, Netapp does business in the state of Delaware by, among other things, offering for sale and selling the Netapp Products, as defined below, within the state of Delaware.

9.      Upon information and belief, Defendant Netgear, Inc. ("Netgear") is a corporation organized and existing under the laws of the state of Delaware. Defendant Netgear's registered agent for service of process is Incorporating Services, Ltd., 3500 South DuPont Highway, Dover, Delaware 19901. Upon information and belief, Netgear does business in the state of Delaware by, among other things, offering for sale and selling the Netgear Products, as defined below, within the state of Delaware.

10.     Upon information and belief, Defendant Qnap Systems, Inc. ("Qnap") is a corporation organized and existing under the laws of the state of California.  Upon information and belief, Qnap's registered agent for service of process is Chia-Lin Chen, 166 University

Parkway, Pomona, California 91768.  Upon information and belief, Qnap has offered for sale and/or sold the Qnap Products (as defined below) within the state of Delaware.

## Jurisdiction and Venue

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and/or 1338.

12.     This Court has personal jurisdiction over Defendants D-Link, Infortrend, and Qnap by virtue of these companies' offering for sale and selling their respective "Products," defined below, within the state of Delaware and, upon information and belief, by these companies' deriving significant revenue from such sales.  Personal jurisdiction exists over the remaining Defendants by virtue of their being incorporated in Delaware and their doing business in the state of Delaware.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and/or 1400.

## Operative Facts

### The Patents-In-Suit

14.     Summit Data is the owner by assignment of all right, title, and interest in the '291 Patent.

15.     The '291 Patent describes a novel computer storage architecture that allows block level access and multiple concurrent logical connections.

16.     Claim 1 of the '291 Patent provides:

1.     A block-level shared network storage system, comprising:

   a storage server comprising an array of disk drives, and comprising a processor that runs a device driver to provide block-level access to data stored on the array of disk drives, wherein the storage server is configurable to provide multiple storage partitions, each of which may be allocated to a different host computer; and

   a host computer coupled to the storage server by at least one computer network;

wherein the host computer and the storage server perform input/output (I/O) operations over the at least one network using multiple, concurrent logical connections, each logical connection being between the host computer and the storage server over the at least one computer network, such that a first I/O operation is executed over a first logical connection while a second I/O operation is executed over a second logical connection.

'291 Patent, Col. 21, l. 62-Col. 22, l. 27.

17.     Summit Data is the owner by assignment of all right, title, and interest in the '581 Patent.

18.     The '581 Patent also describes a novel computer storage architecture that allows block level access and multiple concurrent TCP/IP logical connections.

19.     Claim 1 of the '581 Patent provides:

1.     A storage server, comprising:

a disk array controller configured to control a plurality of disk drives, said disk array controller configured to operate the plurality of disk drives as a disk array;

at least one network interface for connecting the storage server to at least one network; and

a processor coupled to the disk array controller and to the at least one network interface, said processor programmed to communicate over said at least one network with one or more host computers via multiple concurrent logical connections and to perform input/output operations in parallel over the multiple concurrent logical connections, each input/output operation including a transfer of data between a host computer and the disk array via said disk array controller and said at least one network interface;

wherein the logical connections are TCP/IP connections, and the storage server is configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

'581 Patent, Col. 21, l. 60-Col. 22, l. 12.

**The Infringing Products**

**Defendant EMC's Products**

20.     Defendant EMC, within the United States, manufactures, uses, offers for sale, or sells network storage devices and other products, including, but not limited to, the CLARiiON AX100 (collectively, the "EMC Products").  The EMC Products, among other things, are storage servers and associated software comprised of an array of disks and a processor that allow block level access and multiple concurrent TCP/IP logical connections between a host computer and the disk array, with the storage server being configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

21.     The EMC Products satisfy at least the "storage server" limitation set forth in at least claim 1 of the '291 Patent.

22.     Upon information and belief, EMC utilizes one or more of the EMC Products in its internal operations as part of a block-level shared network storage system.  In such operations, the EMC Product, upon information and belief, is connected to a network through a network interface and through such network to at least one computer that, through software provided by EMC and in conjunction with the EMC Product, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

23.     Such internal use by EMC of the block-level shared network storage system, including the EMC Products, meets each limitation of at least claim 1 of the '291 Patent.

24.     Customers of EMC purchase the EMC Products for, among other things, their internal operations.  In such operations, the EMC Products, upon information and belief, are connected to a network through a network interface and through such network to at least one

computer that, through software provided by EMC and in conjunction with the EMC Products, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

25.     Documentation accompanying the EMC Products and/or available from EMC's website instructs a customer how to connect the EMC Products to a network through a network interface and through such network to at least one computer that, through software provided by EMC and in conjunction with the EMC Products, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

26.     Such use by EMC's customers—in accordance with the instructions provided by EMC—of a block-level shared network storage system, including the EMC Products, meets each limitation of at least Claim 1 of the '291 Patent.

27.     The EMC Products are storage servers that are comprised of a disk array controller configured to control a plurality of disk drives and operate such drives as a disk array.

28.     The EMC Products are storage servers that are comprised of a network interface for connecting the storage server to at least one network.

29.     The EMC Products are storage servers that are comprised of a processor coupled to the disk array controller and at least one network interface. The processor is programmed to communicate over at least one network with at least one host computer via multiple concurrent TCP/IP logical connections and to perform IO operations in parallel over the multiple logical connections that include the transfer of data between the host computer and disk array through the disk array controller and network.  The EMC Products are storage servers that are also

configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

30.     The EMC Products—as manufactured, sold, or offered for sale by Defendant EMC—meet each limitation of at least Claim 1 of the '581 Patent.

31.     Upon information and belief, EMC utilizes one or more of the EMC Products in its internal operations as a network storage server.  In such operations, the EMC Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

32.     Such internal use by EMC of the EMC Products meets each limitation of at least Claim 1 of the '581 Patent.

33.     Customers of EMC purchase the EMC Products for, among other things, their internal operations.  In such operations, the EMC Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

34.     Documentation accompanying the EMC Products and/or available from EMC's website instructs a customer how to connect the EMC Products to a network through a network interface and through such network to at least one computer that, through software provided by EMC and in conjunction with the EMC Products, performs input/output ("I/O") operations over multiple concurrent TCP/IP logical connections to transfer data between the host computer and disk array via the disk array controller and a network interface.

35.     Such use by EMC's customers—in accordance with the instructions provided by EMC—of the EMC Products as a storage server meets each limitation of at least Claim 1 of the '581 Patent.

36.     Defendant EMC has been aware of the '291 Patent and '581 Patent since at least the date upon which Summit Data filed its initial Complaint, instituting this action.

37.     Defendant EMC does not have a license or other authorization to practice the claims set forth in either the '291 Patent or '581 Patent.

**Defendant Buffalo's Products**

38.     Defendant Buffalo, within the United States, manufactures, uses, offers for sale, or sells network storage devices and other products, including, but not limited to, the Terastation Pro (collectively, the "Buffalo Products").   The Buffalo Products, among other things, are storage servers comprised of an array of disks and a processor that allows block level access and multiple concurrent TCP/IP logical connections between a host computer and the disk array, with the storage server being configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

39.     The Buffalo Products satisfy at least the "storage server" limitation set forth in at least claim 1 of the '291 Patent.

40.     Upon information and belief, Buffalo utilizes one or more of the Buffalo Products in its internal operations as part of a block-level shared network storage system.   In such operations, the Buffalo Product, upon information and belief, is connected to a network through a network interface and through such network to at least one computer that, through software provided by Buffalo and in conjunction with the Buffalo Product, performs input/output ("I/O")

operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

41.    Such internal use by Buffalo of the block-level shared network storage system, including the Buffalo Products, meets each limitation of at least Claim 1 of the '291 Patent.

42.    Customers of Buffalo purchase the Buffalo Products for, among other things, their internal operations.  In such operations, the Buffalo Products, upon information and belief, are connected to a network through a network interface and through such network to at least one computer that, through software provided by Buffalo and in conjunction with the Buffalo Products, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

43.    Documentation accompanying the Buffalo Products and/or available from Buffalo's website instructs a customer how to connect the Buffalo Products to a network through a network interface and through such network to at least one computer that, through software provided by Buffalo and in conjunction with the Buffalo Products, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

44.    Such use by Buffalo's customers—in accordance with the instructions provided by Buffalo—of a block-level shared network storage system, including the Buffalo Products, meets each limitation of at least Claim 1 of the '291 Patent.

45.    The Buffalo Products are storage servers that are comprised of a disk array controller configured to control a plurality of disk drives and operate such drives as a disk array.

46.     The Buffalo Products are storage servers that are comprised of a network interface for connecting the storage server to at least one network.

47.     The Buffalo Products are storage servers that are comprised of a processor coupled to the disk array controller and at least one network interface. The processor is programmed to communicate over at least one network with at least one host computer via multiple concurrent TCP/IP logical connections and to perform IO operations in parallel over the multiple logical connections that include the transfer of data between the host computer and disk array through the disk array controller and network. The Buffalo Products are storage servers that are also configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

48.     The Buffalo Products—as manufactured, sold, or offered for sale by Defendant Buffalo—meet each limitation of at least Claim 1 of the '581 Patent.

49.     Upon information and belief, Buffalo utilizes one or more of the Buffalo Products in its internal operations as a network storage server.  In such operations, the Buffalo Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

50.     Such internal use by Buffalo of the Buffalo Products meets each limitation of at least Claim 1 of the '581 Patent.

51.     Customers of Buffalo purchase the Buffalo Products for, among other things, their internal operations.  In such operations, the Buffalo Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described

in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

52.     Documentation accompanying the Buffalo Products and/or available from Buffalo's website instructs a customer how to connect the Buffalo Products to a network through a network interface and through such network to at least one computer that, through software provided by Buffalo and in conjunction with the Buffalo Products, performs input/output ("I/O") operations over multiple concurrent TCP/IP logical connections to transfer data between the host computer and disk array via the disk array controller and a network interface.

53.     Such use by Buffalo's customers—in accordance with the instructions provided by Buffalo—of the Buffalo Products as a storage server meets each limitation of at least Claim 1 of the '581 Patent.

54.     Defendant Buffalo has been aware of the '291 Patent and '581 Patent since at least the date upon which Summit Data filed its initial Complaint, instituting this action.

55.     Defendant Buffalo does not have a license or other authorization to practice the claims set forth in either the '291 Patent or '581 Patent.

**Defendant D-Link's Products**

56.     Defendant D-Link, within the United States, manufactures, uses, offers for sale, or sells network storage devices and other products, including, but not limited to, the xStack Storage DSN-1100-10 ISCSI SAN Array, (collectively, the "D-Link Products"). The D-Link Products, among other things, are storage servers comprised of an array of disks and a processor that allows block level access and multiple concurrent TCP/IP logical connections between a host computer and the disk array, with the storage server being configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

57.     The D-Link Products satisfy at least the "storage server" limitation set forth in at least claim 1 of the '291 Patent.

58.     Upon information and belief, D-Link utilizes one or more of the D-Link Products in its internal operations as part of a block-level shared network storage system.   In such operations, the D-Link Product, upon information and belief, is connected to a network through a network interface and through such network to at least one computer that, through software provided by D-Link and in conjunction with the D-Link Product, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

59.     Such internal use by D-Link of the block-level shared network storage system, including the D-Link Products, meets each limitation of at least Claim 1 of the '291 Patent.

60.     Customers of D-Link purchase the D-Link Products for, among other things, their internal operations.   In such operations, the D-Link Products, upon information and belief, are connected to a network through a network interface and through such network to at least one computer that, through software provided by D-Link and in conjunction with the D-Link Products, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

61.     Documentation accompanying the D-Link Products and/or available from D-Link's website instructs a customer how to connect the D-Link Products to a network through a network interface and through such network to at least one computer that, through software provided by D-Link and in conjunction with the D-Link Products, performs input/output ("I/O")

operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

62.     Such use by D-Link's customers—in accordance with the instructions provided by D-Link—of a block-level shared network storage system, including the D-Link Products, meets each limitation of at least Claim 1 of the '291 Patent.

63.     The D-Link Products are storage servers that are comprised of a disk array controller configured to control a plurality of disk drives and operate such drives as a disk array.

64.     The D-Link Products are storage servers that are comprised of a network interface for connecting the storage server to at least one network.

65.     The D-Link Products are storage servers that are comprised of a processor coupled to the disk array controller and at least one network interface. The processor is programmed to communicate over at least one network with at least one host computer via multiple concurrent TCP/IP logical connections and to perform IO operations in parallel over the multiple logical connections that include the transfer of data between the host computer and disk array through the disk array controller and network.  The D-Link Products are storage servers that are also configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

66.     The D-Link Products—as manufactured, sold, or offered for sale by Defendant D-Link—meet each limitation of at least Claim 1 of the '581 Patent.

67.     Upon information and belief, D-Link utilizes one or more of the D-Link Products in its internal operations as a network storage server.  In such operations, the D-Link Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface,

and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

68.     Such internal use by D-Link of the D-Link Products meets each limitation of at least Claim 1 of the '581 Patent.

69.     Customers of D-Link purchase the D-Link Products for, among other things, their internal operations.  In such operations, the D-Link Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

70.     Documentation accompanying the D-Link Products and/or available from D-Link's website instructs a customer how to connect the D-Link Products to a network through a network interface and through such network to at least one computer that, through software provided by D-Link and in conjunction with the D-Link Products, performs input/output ("I/O") operations over multiple concurrent TCP/IP logical connections to transfer data between the host computer and disk array via the disk array controller and a network interface.

71.     Such use by D-Link's customers—in accordance with the instructions provided by D-Link—of the D-Link Products as a storage server meets each limitation of at least Claim 1 of the '581 Patent.

72.     Defendant D-Link has been aware of the '291 Patent and '581 Patent since at least the date upon which Summit Data filed its initial Complaint, instituting this action.

73.     Defendant D-Link does not have a license or other authorization to practice the claims set forth in either the '291 Patent or '581 Patent.

**Defendant Hitachi's Products**

74.     Defendant Hitachi, within the United States, manufactures, uses, offers for sale, or sells modular storage controllers and other products, including, but not limited to, the Simple Modular Storage 100 (collectively, the "Hitachi Products").  The Hitachi Products, among other things, ascertain whether the controller is connected to a ATA or SCSI drive and utilize the appropriate protocol to communicate with the disk based upon this determination.

75.     The Hitachi Products satisfy at least the "storage server" limitation set forth in at least claim 1 of the '291 Patent.

76.     Upon information and belief, Hitachi utilizes one or more of the Hitachi Products in its internal operations as part of a block-level shared network storage system.  In such operations, the Hitachi Product, upon information and belief, is connected to a network through a network interface and through such network to at least one computer that, through software provided by Hitachi and in conjunction with the Hitachi Product, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

77.     Such internal use by Hitachi of the block-level shared network storage system, including the Hitachi Products, meets each limitation of at least Claim 1 of the '291 Patent.

78.     Customers of Hitachi purchase the Hitachi Products for, among other things, their internal operations.  In such operations, the Hitachi Products, upon information and belief, are connected to a network through a network interface and through such network to at least one computer that, through software provided by Hitachi and in conjunction with the Hitachi Products, performs input/output ("I/O") operations over multiple logical connections, with a first

IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

79.     Documentation accompanying the Hitachi Products and/or available from Hitachi's website instructs a customer how to connect the Hitachi Products to a network through a network interface and through such network to at least one computer that, through software provided by Hitachi and in conjunction with the Hitachi Products, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

80.     Such use by Hitachi's customers—in accordance with the instructions provided by Hitachi—of a block-level shared network storage system, including the Hitachi Products, meets each limitation of at least Claim 1 of the '291 Patent.

81.     The Hitachi Products are storage servers that are comprised of a disk array controller configured to control a plurality of disk drives and operate such drives as a disk array.

82.     The Hitachi Products are storage servers that are comprised of a network interface for connecting the storage server to at least one network.

83.     The Hitachi Products are storage servers that are comprised of a processor coupled to the disk array controller and at least one network interface. The processor is programmed to communicate over at least one network with at least one host computer via multiple concurrent TCP/IP logical connections and to perform IO operations in parallel over the multiple logical connections that include the transfer of data between the host computer and disk array through the disk array controller and network.  The Hitachi Products are storage servers that are also configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

84.     The Hitachi Products—as manufactured, sold, or offered for sale by Defendant Hitachi—meet each limitation of at least Claim 1 of the '581 Patent.

85.     Upon information and belief, Hitachi utilizes one or more of the Hitachi Products in its internal operations as a network storage server.  In such operations, the Hitachi Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

86.     Such internal use by Hitachi of the Hitachi Products meets each limitation of at least Claim 1 of the '581 Patent.

87.     Customers of Hitachi purchase the Hitachi Products for, among other things, their internal operations.  In such operations, the Hitachi Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

88.     Documentation accompanying the Hitachi Products and/or available from Hitachi's website instructs a customer how to connect the Hitachi Products to a network through a network interface and through such network to at least one computer that, through software provided by Hitachi and in conjunction with the Hitachi Products, performs input/output ("I/O") operations over multiple concurrent TCP/IP logical connections to transfer data between the host computer and disk array via the disk array controller and a network interface.

89.     Such use by Hitachi's customers—in accordance with the instructions provided by Hitachi—of the Hitachi Products as a storage server meets each limitation of at least Claim 1 of the '581 Patent.

90.     Defendant Hitachi has been aware of the '291 Patent and '581 Patent since at least the date upon which Summit Data filed its initial Complaint, instituting this action.

91.     Defendant Hitachi does not have a license or other authorization to practice the claims set forth in either the '291 Patent or '581 Patent.

**Defendant Infortrend's Products**

92.     Defendant Infortrend, within the United States, manufactures, uses, offers for sale, or sells network storage devices and other products, including, but not limited to, the EonStor DS-ISCSI Series, (collectively, the "Infortrend Products"). The Infortrend Products, among other things, are storage servers comprised of an array of disks and a processor that allows block level access and multiple concurrent TCP/IP logical connections between a host computer and the disk array, with the storage server being configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

93.     The Infortrend Products satisfy at least the "storage server" limitation set forth in at least claim 1 of the '291 Patent.

94.     Upon information and belief, Infortrend utilizes one or more of the Infortrend Products in its internal operations as part of a block-level shared network storage system. In such operations, the Infortrend Product, upon information and belief, is connected to a network through a network interface and through such network to at least one computer that, through software provided by Infortrend and in conjunction with the Infortrend Product, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

95.     Such internal use by Infortrend of the block-level shared network storage system, including the Infortrend Products, meets each limitation of at least Claim 1 of the '291 Patent.

96.     Customers of Infortrend purchase the Infortrend Products for, among other things, their internal operations.  In such operations, the Infortrend Products, upon information and belief, are connected to a network through a network interface and through such network to at least one computer that, through software provided by Infortrend and in conjunction with the Infortrend Products, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

97.     Documentation accompanying the Infortrend Products and/or available from Infortrend's website instructs a customer how to connect the Infortrend Products to a network through a network interface and through such network to at least one computer that, through software provided by Infortrend and in conjunction with the Infortrend Products, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

98.     Such use by Infortrend's customers—in accordance with the instructions provided by Infortrend—of a block-level shared network storage system, including the Infortrend Products, meets each limitation of at least Claim 1 of the '291 Patent.

99.     The Infortrend Products are storage servers that are comprised of a disk array controller configured to control a plurality of disk drives and operate such drives as a disk array.

100.    The Infortrend Products are storage servers that are comprised of a network interface for connecting the storage server to at least one network.

101.     The Infortrend Products are storage servers that are comprised of a processor coupled to the disk array controller and at least one network interface. The processor is programmed to communicate over at least one network with at least one host computer via multiple concurrent TCP/IP logical connections and to perform IO operations in parallel over the multiple logical connections that include the transfer of data between the host computer and disk array through the disk array controller and network.  The Infortrend Products are storage servers that are also configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

102.     The Infortrend Products—as manufactured, sold, or offered for sale by Defendant Infortrend—meet each limitation of at least Claim 1 of the '581 Patent.

103.     Upon information and belief, Infortrend utilizes one or more of the Infortrend Products in its internal operations as a network storage server.  In such operations, the Infortrend Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

104.     Such internal use by Infortrend of the Infortrend Products meets each limitation of at least Claim 1 of the '581 Patent.

105.     Customers of Infortrend purchase the Infortrend Products for, among other things, their internal operations.  In such operations, the Infortrend Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

106.    Documentation accompanying the Infortrend Products and/or available from Infortrend's website instructs a customer how to connect the Infortrend Products to a network through a network interface and through such network to at least one computer that, through software provided by Infortrend and in conjunction with the Infortrend Products, performs input/output ("I/O") operations over multiple concurrent TCP/IP logical connections to transfer data between the host computer and disk array via the disk array controller and a network interface.

107.    Such use by Infortrend's customers—in accordance with the instructions provided by Infortrend—of the Infortrend Products as a storage server meets each limitation of at least Claim 1 of the '581 Patent.

108.    Defendant Infortrend has been aware of the '291 Patent and '581 Patent since at least the date upon which Summit Data filed its initial Complaint, instituting this action.

109.    Defendant Infortrend does not have a license or other authorization to practice the claims set forth in either the '291 Patent or '581 Patent.

**Defendant Netapp's Products**

110.    Defendant Netapp, within the United States, manufactures, uses, offers for sale, or sells network storage devices and other products, including, but not limited to, the Netapp FAS250 (collectively, the "Netapp Products"). The Netapp Products, among other things, are storage servers comprised of an array of disks and a processor that allows block level access and multiple concurrent TCP/IP logical connections between a host computer and the disk array, with the storage server being configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

111.    The Netapp Products satisfy at least the "storage server" limitation set forth in at least claim 1 of the '291 Patent.

112.    Upon information and belief, Netapp utilizes one or more of the Netapp Products in its internal operations as part of a block-level shared network storage system.   In such operations, the Netapp Product, upon information and belief, is connected to a network through a network interface and through such network to at least one computer that, through software provided by Netapp and in conjunction with the Netapp Product, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

113.    Such internal use by Netapp of the block-level shared network storage system, including the Netapp Products, meets each limitation of at least Claim 1 of the '291 Patent.

114.    Customers of Netapp purchase the Netapp Products for, among other things, their internal operations.   In such operations, the Netapp Products, upon information and belief, are connected to a network through a network interface and through such network to at least one computer that, through software provided by Netapp and in conjunction with the Netapp Products, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

115.    Documentation accompanying the Netapp Products and/or available from Netapp's website instructs a customer how to connect the Netapp Products to a network through a network interface and through such network to at least one computer that, through software provided by Netapp and in conjunction with the Netapp Products, performs input/output ("I/O")

operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

116.    Such use by Netapp's customers—in accordance with the instructions provided by Netapp—of a block-level shared network storage system, including the Netapp Products, meets each limitation of at least Claim 1 of the '291 Patent.

117.    The Netapp Products are storage servers that are comprised of a disk array controller configured to control a plurality of disk drives and operate such drives as a disk array.

118.    The Netapp Products are storage servers that are comprised of a network interface for connecting the storage server to at least one network.

119.    The Netapp Products are storage servers that are comprised of a processor coupled to the disk array controller and at least one network interface. The processor is programmed to communicate over at least one network with at least one host computer via multiple concurrent TCP/IP logical connections and to perform IO operations in parallel over the multiple logical connections that include the transfer of data between the host computer and disk array through the disk array controller and network.  The Netapp Products are storage servers that are also configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

120.    The Netapp Products—as manufactured, sold, or offered for sale by Defendant Netapp—meet each limitation of at least Claim 1 of the '581 Patent.

121.    Upon information and belief, Netapp utilizes one or more of the Netapp Products in its internal operations as a network storage server.  In such operations, the Netapp Product, upon information and belief, is comprised of: (i) a disk array controller, (ii) a network interface,

and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

122.    Such internal use by Netapp of the Netapp Products meets each limitation of at least Claim 1 of the '581 Patent.

123.    Customers of Netapp purchase the Netapp Products for, among other things, their internal operations.  In such operations, the Netapp Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

124.    Documentation accompanying the Netapp Products and/or available from Netapp's website instructs a customer how to connect the Netapp Products to a network through a network interface and through such network to at least one computer that, through software provided by Netapp and in conjunction with the Netapp Products, performs input/output ("I/O") operations over multiple concurrent TCP/IP logical connections to transfer data between the host computer and disk array via the disk array controller and a network interface.

125.    Such use by Netapp's customers—in accordance with the instructions provided by Netapp—of the Netapp Products as a storage server meets each limitation of at least Claim 1 of the '581 Patent.

126.    Defendant Netapp has been aware of the '291 Patent and '581 Patent since at least the date upon which Summit Data filed its initial Complaint, instituting this action.

127.    Defendant Netapp does not have a license or other authorization to practice the claims set forth in either the '291 Patent or '581 Patent.

**Defendant Netgear's Products**

128.    Defendant Netgear, within the United States, manufactures, uses, offers for sale, or sells network storage devices and other products, including, but not limited to, the ReadyNAS NVX, (collectively, the "Netgear Products").  The Netgear Products, among other things, are storage servers comprised of an array of disks and a processor that allows block level access and multiple concurrent TCP/IP logical connections between a host computer and the disk array, with the storage server being configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

129.    The Netgear Products satisfy at least the "storage server" limitation set forth in at least claim 1 of the '291 Patent.

130.    Upon information and belief, Netgear utilizes one or more of the Netgear Products in its internal operations as part of a block-level shared network storage system.  In such operations, the Netgear Product, upon information and belief, is connected to a network through a network interface and through such network to at least one computer that, through software provided by Netgear and in conjunction with the Netgear Product, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

131.    Such internal use by Netgear of the block-level shared network storage system, including the Netgear Products, meets each limitation of at least Claim 1 of the '291 Patent.

132.    Customers of Netgear purchase the Netgear Products for, among other things, their internal operations.  In such operations, the Netgear Products, upon information and belief, are connected to a network through a network interface and through such network to at least one

computer that, through software provided by Netgear and in conjunction with the Netgear Products, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

133.    Documentation accompanying the Netgear Products and/or available from Netgear's website instructs a customer how to connect the Netgear Products to a network through a network interface and through such network to at least one computer that, through software provided by Netgear and in conjunction with the Netgear Products, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

134.    Such use by Netgear's customers—in accordance with the instructions provided by Netgear—of a block-level shared network storage system, including the Netgear Products, meets each limitation of at least Claim 1 of the '291 Patent.

135.    The Netgear Products are storage servers that are comprised of a disk array controller configured to control a plurality of disk drives and operate such drives as a disk array.

136.    The Netgear Products are storage servers that are comprised of a network interface for connecting the storage server to at least one network.

137.    The Netgear Products are storage servers that are comprised of a processor coupled to the disk array controller and at least one network interface. The processor is programmed to communicate over at least one network with at least one host computer via multiple concurrent TCP/IP logical connections and to perform IO operations in parallel over the multiple logical connections that include the transfer of data between the host computer and disk

array through the disk array controller and network.  The Netgear Products are storage servers that are also configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

138.    The Netgear Products—as manufactured, sold, or offered for sale by Defendant Netgear—meet each limitation of at least Claim 1 of the '581 Patent.

139.    Upon information and belief, Netgear utilizes one or more of the Netgear Products in its internal operations as a network storage server.  In such operations, the Netgear Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

140.    Such internal use by Netgear of the Netgear Products meets each limitation of at least Claim 1 of the '581 Patent.

141.    Customers of Netgear purchase the Netgear Products for, among other things, their internal operations.  In such operations, the Netgear Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

142.    Documentation accompanying the Netgear Products and/or available from Netgear's website instructs a customer how to connect the Netgear Products to a network through a network interface and through such network to at least one computer that, through software provided by Netgear and in conjunction with the Netgear Products, performs input/output ("I/O") operations over multiple concurrent TCP/IP logical connections to transfer

data between the host computer and disk array via the disk array controller and a network interface.

143.    Such use by Netgear's customers—in accordance with the instructions provided by Netgear—of the Netgear Products as a storage server meets each limitation of at least Claim 1 of the '581 Patent.

144.    Defendant Netgear has been aware of the '291 Patent and '581 Patent since at least the date upon which Summit Data filed its initial Complaint, instituting this action.

145.    Defendant Netgear does not have a license or other authorization to practice the claims set forth in either the '291 Patent or '581 Patent.

**Defendant Qnap's Products**

146.    Defendant Qnap, within the United States, manufactures, uses, offers for sale, or sells network storage devices and other products, including, but not limited to, the TURBO NAS, (collectively, the "Qnap Products").  The Qnap Products, among other things, are storage servers comprised of an array of disks and a processor that allows block level access and multiple concurrent TCP/IP logical connections between a host computer and the disk array, with the storage server being configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

147.    The Qnap Products satisfy at least the "storage server" limitation set forth in at least claim 1 of the '291 Patent.

148.    Upon information and belief, Qnap utilizes one or more of the Qnap Products in its internal operations as part of a block-level shared network storage system.  In such operations, the Qnap Product, upon information and belief, is connected to a network through a network interface and through such network to at least one computer that, through software provided by

Qnap and in conjunction with the Qnap Product, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

149.     Such internal use by Qnap of the block-level shared network storage system, including the Qnap Products, meets each limitation of at least Claim 1 of the '291 Patent.

150.     Customers of Qnap purchase the Qnap Products for, among other things, their internal operations.  In such operations, the Qnap Products, upon information and belief, are connected to a network through a network interface and through such network to at least one computer that, through software provided by Qnap and in conjunction with the Qnap Products, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

151.     Documentation accompanying the Qnap Products and/or available from Qnap's website instructs a customer how to connect the Qnap Products to a network through a network interface and through such network to at least one computer that, through software provided by Qnap and in conjunction with the Qnap Products, performs input/output ("I/O") operations over multiple logical connections, with a first IO operation executed over a first logical connection and a second IO operation executed over a second logical connection.

152.     Such use by Qnap's customers—in accordance with the instructions provided by Qnap—of a block-level shared network storage system, including the Qnap Products, meets each limitation of at least Claim 1 of the '291 Patent.

153.     The Qnap Products are storage servers that are comprised of a disk array controller configured to control a plurality of disk drives and operate such drives as a disk array.

154.    The Qnap Products are storage servers that are comprised of a network interface for connecting the storage server to at least one network.

155.    The Qnap Products are storage servers that are comprised of a processor coupled to the disk array controller and at least one network interface. The processor is programmed to communicate over at least one network with at least one host computer via multiple concurrent TCP/IP logical connections and to perform IO operations in parallel over the multiple logical connections that include the transfer of data between the host computer and disk array through the disk array controller and network.  The Qnap Products are storage servers that are also configurable to provide multiple storage partitions, each of which may be allocated to a different host computer.

156.    The Qnap Products—as manufactured, sold, or offered for sale by Defendant Qnap—meet each limitation of at least Claim 1 of the '581 Patent.

157.    Upon information and belief, Qnap utilizes one or more of the Qnap Products in its internal operations as a network storage server.  In such operations, the Qnap Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

158.    Such internal use by Qnap of the Qnap Products meets each limitation of at least Claim 1 of the '581 Patent.

159.    Customers of Qnap purchase the Qnap Products for, among other things, their internal operations.  In such operations, the Qnap Product, upon information and belief, is comprised of:  (i) a disk array controller, (ii) a network interface, and (iii) processor, as described

in ¶¶ 28-30, above and is operated in conjunction with at least one network and at least one host computer.

160.    Documentation accompanying the Qnap Products and/or available from Qnap's website instructs a customer how to connect the Qnap Products to a network through a network interface and through such network to at least one computer that, through software provided by Qnap and in conjunction with the Qnap Products, performs input/output ("I/O") operations over multiple concurrent TCP/IP logical connections to transfer data between the host computer and disk array via the disk array controller and a network interface.

161.    Such use by Qnap's customers—in accordance with the instructions provided by Qnap—of the Qnap Products as a storage server meets each limitation of at least Claim 1 of the '581 Patent.

162.    Defendant Qnap has been aware of the '291 Patent and '581 Patent since at least the date upon which Summit Data filed its initial Complaint, instituting this action.

163.    Defendant Qnap does not have a license or other authorization to practice the claims set forth in either the '291 Patent or '581 Patent.

164.    All conditions precedent to the assertion of the claims set forth in this Complaint have been satisfied or waived.

## Count One
## EMC's Infringement of the '291 Patent

165.    Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-3, 11-16, 20-26, 36-37, and 164.

166.    As described above, EMC has utilized internally the EMC Products, in conjunction with a network and host computer, which use directly infringes at least Claim 1 of the '291 Patent.

167.    As described above, EMC has sold the EMC Products and provided instructions with such products or on its website to utilize such EMC Products as part of a block-level shared network storage system that meets each limitation of at least Claim 1 of the '291 Patent.

168.    Since at least the date of the filing of the initial Complaint in this action, Defendant EMC has taken such actions with full knowledge of the '291 Patent and knew or should have known that such actions would cause infringement of the '291 Patent by EMC's customers.  Defendant EMC's inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

169.    Summit Data has suffered damages as the direct and proximate result of Defendant EMC's infringement of the '291 Patent.

**Count Two**
**EMC's Infringement of the '581 Patent**

170.    Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-3, 11-13, 17-20, 27-37, and 164.

171.    By reason of some or all of the foregoing, Defendant EMC has directly infringed at least Claim 1 of the '581 Patent.  Defendant EMC's direct infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

172.    As described above, EMC has sold or offered for sale the EMC Products and provided instructions with such products or on its website to utilize such EMC Products as a storage server that meets each limitation of at least Claim 1 of the '581 Patent.

173.    Since at least the date of the filing of the initial Complaint in this action, Defendant has taken such actions with full knowledge of the '581 Patent and knew or should have known that such actions would cause infringement of the '581 Patent.  Defendant EMC's

inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

174.    Summit Data has suffered damages as the direct and proximate result of Defendant EMC's infringement of the '581 Patent.

## Count Three
## Buffalo's Infringement of the '291 Patent

175.    Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 4, 11-16, 38-44, 54-55, and 164.

176.    As described above, Buffalo has utilized internally the Buffalo Products, in conjunction with a network and host computer, which use directly infringes at least Claim 1 of the '291 Patent.

177.    As described above, Buffalo has sold or offered for sale the Buffalo Products and provided instructions with such products or on its website to utilize such Buffalo Products as part of a block-level shared network storage system that meets each limitation of at least Claim 1 of the '291 Patent.

178.    Since at least the date of the filing of the initial Complaint in this action, Defendant Buffalo has taken such actions with full knowledge of the '291 Patent and knew or should have known that such actions would cause infringement of the '291 Patent by Buffalo's customers.  Defendant Buffalo's inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

179.    Summit Data has suffered damages as the direct and proximate result of Defendant Buffalo's infringement of the '291 Patent.

**Count Four**
**Buffalo's Infringement of the ' 581 Patent**

180.    Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 4, 11-13, 17-19, 38, 45-55, and 164.

181.    By reason of some or all of the foregoing, Defendant Buffalo has directly infringed at least Claim 1 of the '581 Patent.  Defendant Buffalo's direct infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

182.    As described above, Buffalo has sold or offered for sale the Buffalo Products and provided instructions with such products or on its website to utilize such Buffalo Products as a storage server that meets each limitation of at least Claim 1 of the '581 Patent.

183.    Since at least the date of the filing of the initial Complaint in this action, Defendant has taken such actions with full knowledge of the '581 Patent and knew or should have known that such actions would cause infringement of the '581 Patent.  Defendant Buffalo's inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

184.    Summit Data has suffered damages as the direct and proximate result of Defendant Buffalo's infringement of the '581 Patent.

**Count Five**
**D-Link's Infringement of the '291Patent**

185.    Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 5, 11-16, 56-62, 72-73, and 164.

186.    As described above, D-Link has utilized internally the D-Link Products, in conjunction with a network and host computer, which use directly infringes at least Claim 1 of the '291 Patent.

187.     As described above, D-Link has sold or offered for sale the D-Link Products and provided instructions with such products or on its website to utilize such D-Link Products as part of a block-level shared network storage system that meets each limitation of at least Claim 1 of the '291 Patent.

188.     Since at least the date of the filing of the initial Complaint in this action, Defendant D-Link has taken such actions with full knowledge of the '291 Patent and knew or should have known that such actions would cause infringement of the '291 Patent by D-Link's customers.  Defendant D-Link's inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

189.     Summit Data has suffered damages as the direct and proximate result of Defendant D-Link's infringement of the '291 Patent.

**Count Six**
**<u>D-Link's Infringement of the ' 581Patent</u>**

190.     Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 5, 11-13, 17-19, 56, 63-73, and 164.

191.     By reason of some or all of the foregoing, Defendant D-Link has directly infringed at least Claim 1 of the '581 Patent.  Defendant D-Link's direct infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

192.     As described above, D-Link has sold or offered for sale the D-Link Products and provided instructions with such products or on its website to utilize such D-Link Products as a storage server that meets each limitation of at least Claim 1 of the '581 Patent.

193.     Since at least the date of the filing of the initial Complaint in this action, Defendant has taken such actions with full knowledge of the '581 Patent and knew or should have known that such actions would cause infringement of the '581 Patent.  Defendant D-Link's

inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

194.    Summit Data has suffered damages as the direct and proximate result of Defendant D-Link's infringement of the '581 Patent.

### Count Seven
### Hitachi's Infringement of the '291 Patent

195.    Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 6, 11-16, 74-80, 90-91, 164.

196.    As described above, Hitachi has utilized internally the Hitachi Products, in conjunction with a network and host computer, which use directly infringes at least Claim 1 of the '291 Patent.

197.    As described above, Hitachi has sold or offered for sale the Hitachi Products and provided instructions with such products or on its website to utilize such Hitachi Products as part of a block-level shared network storage system that meets each limitation of at least Claim 1 of the '291 Patent.

198.    Since at least the date of the filing of the initial Complaint in this action, Defendant Hitachi has taken such actions with full knowledge of the '291 Patent and knew or should have known that such actions would cause infringement of the '291 Patent by Hitachi's customers.  Defendant Hitachi's inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

199.    Summit Data has suffered damages as the direct and proximate result of Defendant Hitachi's infringement of the '291 Patent.

**Count Eight**
**Hitachi's Infringement of the '581 Patent**

200.     Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 6, 11-13, 17-19, 74, 81-91, 164.

201.     By reason of some or all of the foregoing, Defendant Hitachi has directly infringed at least Claim 1 of the '581 Patent.  Defendant Hitachi's direct infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

202.     As described above, Hitachi has sold or offered for sale the Hitachi Products and provided instructions with such products or on its website to utilize such Hitachi Products as a storage server that meets each limitation of at least Claim 1 of the '581 Patent.

203.     Since at least the date of the filing of the initial Complaint in this action, Defendant has taken such actions with full knowledge of the '581 Patent and knew or should have known that such actions would cause infringement of the '581 Patent.  Defendant Hitachi's inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

204.     Summit Data has suffered damages as the direct and proximate result of Defendant Hitachi's infringement of the '581 Patent.

**Count Nine**
**Infortrend's Infringement of the '291 Patent**

205.     Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 7, 11-16, 92-98, 108-109, 164.

206.     As described above, Infortrend has utilized internally the Infortrend Products, in conjunction with a network and host computer, which use directly infringes at least Claim 1 of the '291 Patent.

- 38 -

207.     As described above, Infortrend has sold or offered for sale the Infortrend Products and provided instructions with such products or on its website to utilize such Infortrend Products as part of a block-level shared network storage system that meets each limitation of at least Claim 1 of the '291 Patent.

208.     Since at least the date of the filing of the initial Complaint in this action, Defendant Infortrend has taken such actions with full knowledge of the '291 Patent and knew or should have known that such actions would cause infringement of the '291 Patent by Infortrend's customers.  Defendant Infortrend's inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

209.     Summit Data has suffered damages as the direct and proximate result of Defendant Infortrend's infringement of the '291 Patent.

**Count Ten**
**Infortrend's Infringement of the '581 Patent**

210.     Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 7, 11-13, 17-19, 92, 99-109, 164.

211.     By reason of some or all of the foregoing, Defendant Infortrend has directly infringed at least Claim 1 of the '581 Patent.  Defendant Infortrend's direct infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

212.     As described above, Infortrend has sold or offered for sale the Infortrend Products and provided instructions with such products or on its website to utilize such Infortrend Products as a storage server that meets each limitation of at least Claim 1 of the '581 Patent.

213.     Since at least the date of the filing of the initial Complaint in this action, Defendant has taken such actions with full knowledge of the '581 Patent and knew or should have known that such actions would cause infringement of the '581 Patent.    Defendant

Infortrend's inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

214.    Summit Data has suffered damages as the direct and proximate result of Defendant Infortrend's infringement of the '581 Patent.

### Count Eleven
### Netapp's Infringement of the '291 Patent

215.    Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 8, 11-16, 110-116, 126-127, 164.

216.    As described above, Netapp has utilized internally the Netapp Products, in conjunction with a network and host computer, which use directly infringes at least Claim 1 of the '291 Patent.

217.    As described above, Netapp has sold or offered for sale the Netapp Products and provided instructions with such products or on its website to utilize such Netapp Products as part of a block-level shared network storage system that meets each limitation of at least Claim 1 of the '291 Patent.

218.    Since at least the date of the filing of the initial Complaint in this action, Defendant Netapp has taken such actions with full knowledge of the '291 Patent and knew or should have known that such actions would cause infringement of the '291 Patent by Netapp's customers.  Defendant Netapp's inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

219.    Summit Data has suffered damages as the direct and proximate result of Defendant Netapp's infringement of the '291 Patent.

**Count Twelve**
**Netapp's Infringement of the '581 Patent**

220.    Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 8, 11-13, 17-19, 110, 117-127, 164.

221.    By reason of some or all of the foregoing, Defendant Netapp has directly infringed at least Claim 1 of the '581 Patent.  Defendant Netapp's direct infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

222.    As described above, Netapp has sold or offered for sale the Netapp Products and provided instructions with such products or on its website to utilize such Netapp Products as a storage server that meets each limitation of at least Claim 1 of the '581 Patent.

223.    Since at least the date of the filing of the initial Complaint in this action, Defendant has taken such actions with full knowledge of the '581 Patent and knew or should have known that such actions would cause infringement of the '581 Patent.  Defendant Netapp's inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

224.    Summit Data has suffered damages as the direct and proximate result of Defendant Netapp's infringement of the '581 Patent.

**Count Thirteen**
**Netgear's Infringement of the '291 Patent**

225.    Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 9, 11-16, 128-134, 144-145, 164.

226.    As described above, Netgear has utilized internally the Netgear Products, in conjunction with a network and host computer, which use directly infringes at least Claim 1 of the '291 Patent.

227.     As described above, Netgear has sold or offered for sale the Netgear Products and provided instructions with such products or on its website to utilize such Netgear Products as part of a block-level shared network storage system that meets each limitation of at least Claim 1 of the '291 Patent.

228.     Since at least the date of the filing of the initial Complaint in this action, Defendant Netgear has taken such actions with full knowledge of the '291 Patent and knew or should have known that such actions would cause infringement of the '291 Patent by Netgear's customers.  Defendant Netgear's inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

229.     Summit Data has suffered damages as the direct and proximate result of Defendant Netgear's infringement of the '291 Patent.

**Count Fourteen**
**Netgear's Infringement of the '581 Patent**

230.     Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 9, 11-13, 17-19, 128, 135-145, 164.

231.     By reason of some or all of the foregoing, Defendant Netgear has directly infringed at least Claim 1 of the '581 Patent.  Defendant Netgear's direct infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

232.     As described above, Netgear has sold or offered for sale the Netgear Products and provided instructions with such products or on its website to utilize such Netgear Products as a storage server that meets each limitation of at least Claim 1 of the '581 Patent.

233.     Since at least the date of the filing of the initial Complaint in this action, Defendant has taken such actions with full knowledge of the '581 Patent and knew or should have known that such actions would cause infringement of the '581 Patent.  Defendant Netgear's

inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

234.     Summit Data has suffered damages as the direct and proximate result of Defendant Netgear's infringement of the '581 Patent.

**Count Fifteen**
**Qnap's Infringement of the '291 Patent**

235.     Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 10-16, 146-152, 162-164.

236.     As described above, Qnap utilized internally the EMC Products, in conjunction with a network and host computer, which use directly infringes at least Claim 1 of the '291 Patent.

237.     As described above, Qnap has sold the Qnap Products and provided instructions with such products or on its website to utilize such Qnap Products as part of a block-level shared network storage system that meets each limitation of at least Claim 1 of the '291 Patent.

238.     Since at least the date of the filing of the initial Complaint in this action, Defendant Qnap has taken such actions with full knowledge of the '291 Patent and knew or should have known that such actions would cause infringement of the '291 Patent by Qnap's customers.  Defendant Qnap's inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

239.     Summit Data has suffered damages as the direct and proximate result of Defendant Qnap's infringement of the '291 Patent.

**Count Sixteen**
**Qnap's Infringement of the '581 Patent**

240.    Summit Data incorporates by reference as if fully set forth herein the averments contained within Paragraphs 1-2, 10-13, 17-19, 146, 153-164.

241.    By reason of some or all of the foregoing, Defendant Qnap has directly infringed at least Claim 1 of the '581 Patent.  Defendant Qnap's direct infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

242.    As described above, Qnap has sold or offered for sale the Qnap Products and provided instructions with such products or on its website to utilize such Qnap Products as a storage server that meets each limitation of at least Claim 1 of the '581 Patent.

243.    Since at least the date of the filing of the initial Complaint in this action, Defendant has taken such actions with full knowledge of the '581 Patent and knew or should have known that such actions would cause infringement of the '581 Patent.  Defendant Qnap's inducement of infringement has been willful since at least the date of the filing of the original Complaint instituting this action.

244.    Summit Data has suffered damages as the direct and proximate result of Defendant Qnap's infringement of the '581 Patent.

WHEREFORE, Summit Data prays that this Court:

(1)    Enter judgment in favor of Summit Data and against Defendants for infringement, including willful infringement as appropriate, of the '291 Patent, as set forth above;

(2)    Enter judgment in favor of Summit Data and against Defendants for infringement, including willful infringement as appropriate, of the '581 Patent, as set forth above;

(3)     Award damages to Summit Data in an amount to be proven at trial for

Defendants' infringement, pursuant to 35 U.S.C. § 284;

(4)     Declare this to be an exceptional case pursuant to 35 U.S.C. § 285 and award

Summit Data its attorney's fees in this action.

(5)     Award the costs of this action to Summit Data.

(6)     Try this case before a jury; and

(7)     Allow Summit Data to have such other and further relief as the Court deems just

and proper, premises considered.

**PROCTOR HEYMAN, LLP**

*/s/ Neal C. Belgam*
Neal C. Belgam (No. 2721)
nbelgam@proctorheyman.com
Melissa N. Donimirski (# 4701)
mdonimirski@proctorheyman.com
1116 N. West Street
Wilmington, DE 19801
(302) 472-7300

OF COUNSEL:                              Attorneys for Plaintiff Summit Data
                                         Systems, LLC

**MORRIS, MANNING & MARTIN, LLP**
Bryan G. Harrison
bgh@mmmlaw.com
John P. Fry
jfry@mmmlaw.com
W. Andrew McNeil
wmcneil@mmmlaw.com
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326-1044
(404) 233-7000

Dated:  March 21, 2011