## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUMMIT DATA SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10-749 (GMS) |
| | ) | |
| EMC CORPORATION, BUFFALO | ) | |
| TECHNOLOGY (USA), INC., D-LINK | ) | REDACTED - PUBLIC VERSION |
| SYSTEMS, INC., HITACHI DATA | ) | |
| SYSTEMS CORPORATION, | ) | |
| INFORTREND CORPORATION, NETAPP, | ) | |
| INC., NETGEAR, INC. and QNAP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## NETAPP, INC.'S OPENING BRIEF IN SUPPORT OF ITS
## MOTION FOR ATTORNEYS' FEES AND COSTS

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
mflynn@mnat.com

OF COUNSEL:

Edward R. Reines
Byron C. Beebe
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

*Attorneys for Defendant NetApp, Inc.*

Originally Filed: January 29, 2013
Redacted Version Filed: February 5, 2013

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS ..........................................................1

II.   SUMMARY OF ARGUMENT .................................................................................1

III.  STATEMENT OF FACTS ......................................................................................4

    A.   Prior To Filing This Case, Acacia Enters Into A Broad License With RPX Covering Dozens Of Companies ...........................................................................5

    B.   Attempting To Double-Dip, Acacia Sues Storage Equipment Makers And Later Discloses The RPX License ..........................................................................6

    C.   Even Leaving Aside Its Licensing Exhaustion Problem, Acacia's Infringement Theory Is Meritless From The Start ..................................................6

    D.   Acacia Settles Claims  For Nuisance Value ...........................................................7

    E.   Acacia's Infringement Theories Are Proven To Be Baseless..................................8

        1.   Acacia Concedes The Accused Products Are Licensed .............................8

        2.   Acacia Fails To Identify Any Unlicensed Systems That Allegedly Infringe..........................................................................................9

        3.   Acacia's Expert Admits He Made A Big Mistake .....................................9

        4.   Acacia Attempts To Back Out Of The Litigation And Hide Its Conduct ........................................................................................10

IV.   THIS IS AN EXCEPTIONAL CASE AND NETAPP SHOULD BE REIMBURSED ITS ATTORNEYS' FEES ..........................................................10

    A.   NetApp Is The Prevailing Party ...........................................................................11

    B.   This Case Is Objectively Baseless .......................................................................11

        1.   Acacia Had No Basis To Allege Infringement .........................................11

        2.   Acacia Advanced Fatally Flawed Infringement Positions.........................13

        3.   Acacia Refused To Defend Its Litigation Positions On The Merits..........15

    C.   Acacia's Subjective Bad Faith In Pursuing Its Claims Makes This Case Exceptional .........................................................................................15

        1.   Acacia Knew Or Should Have Known That Its Positions Were Unreasonable...........................................................................................16

        2.   Acacia Exploited The High Cost Of Defending Patent Claims.................17

V.    NETAPP'S FEES ARE REASONABLE AND SHOULD BE AWARDED....................18

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acco Brands, Inc. v. ABA Locks Manufacturers Co.*,
  501 F.3d 1307 (Fed. Cir. 2007)...............................................................................16

*Eon-Net LP v. Flagstar Bancorp*,
  653 F.3d 1314 (Fed. Cir. 2011)...............................................................15, 17, 18

*GlobalTech Appliances, Inc. v. SEB*,
  131 S.Ct. 2060 (2011).............................................................................................14

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*,
  687 F.3d 1300 (Fed. Cir. 2012)................................................................10, 11, 15, 16

*Inland Steel Co. v. LTV Steel Co.*,
  364 F.3d 1318 (Fed. Cir. 2004)...............................................................................11

*MarcTec, LLC v. Johnson & Johnson*,
  664 F.3d 907 (Fed. Cir. 2012).................................................................10, 14, 17

*Mathis v. Spears*,
  857 F.2d 749 (Fed. Cir. 1988).................................................................................18

*Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*,
  803 F.2d 684 (Fed. Cir. 1986).................................................................................11

*Micromesh Technology Corp. v. American Recreation Products, Inc.*,
  2007 WL 2501783 (N.D. Cal., Aug. 30, 2007) ........................................................5

*Ohio Willow Wood Co. v. Thermo-Ply, Inc.*,
  629 F.3d 1374 (Fed. Cir. 2011) (Moore, J., concurring) ..........................................7

*PSC Inc. v. Symbol Techs., Inc.*,
  26 F.Supp.2d 505 (W.D.N.Y. 1998) ......................................................................16

*Raylon, LLC v. Complus Data Innovations, Inc.*,
  700 F.3d 1361 (Fed. Cir. 2012)................................................................10, 14, 15

*Takeda Chemical Industries, Ltd. v. Mylan Labs., Inc.*,
  549 F.3d 1381 (Fed. Cir. 2008)...............................................................................19

*Teleconference Sys. v. Proctor & Gamble Pharm., Inc.*,
  676 F.Supp.2d 321 (D.Del. 2009)............................................................................4

**Statutes**

35 U.S.C. § 285 ............................................................................................................1, 10, 18

**Other Authorities**

Federal Rule of Civil Procedure 11 ...............................................................................10

Federal Rule of Civil Procedure 54(d) .............................................................................1

LR 54.1(c) .......................................................................................................................11

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Pursuant to 35 U.S.C. § 285 and Federal Rule of Civil Procedure 54(d), and pursuant to

this Court's January 17, 2013 Order authorizing the filing of this motion (D.I. 235), defendant

NetApp, Inc. ("NetApp") moves for a declaration that this is an exceptional case and an award of

attorneys' fees and costs against plaintiff Summit Data Systems ("Summit"), a subsidiary and

agent of Acacia Research Group (collectively "Acacia"[1]).  Acacia dismissed its patent

infringement claims with prejudice in the face of NetApp's request for leave to file a motion for

summary judgment.   (D.I. 230, 235).

## II.   SUMMARY OF ARGUMENT

This is an exceptional case in which Acacia abused the legal system and inflicted undue

litigation expenses upon NetApp, among others.  Those expenses should be reimbursed.   This

situation results entirely from Acacia's blatant attempt to double dip by seeking litigation

settlements for *already*-licensed products and to insulate its meritless claims from scrutiny by a

pattern of squeezing defendants into nuisance settlements.

Before it filed this suit, Acacia licensed the patents-in-suit in one mass license to 43

major computer companies through an intermediary, RPX.  The plain terms of the RPX license

ensure that every computer system that includes, for example, Microsoft software **REDACTED**

**REDACTED**            is licensed – not to mention the products of 40 other major

companies such as         **REDACTED**          The full roster of licensees are attached to this

brief as Appendix A.  When Acacia served its expert report, after substantial discovery and

nearly two years of litigation, it based its infringement theory on use of a Microsoft feature that

---

[1]     Because Summit is merely an Acacia vehicle for enforcement of the patents-in-suit,
Acacia and Summit are referred to collectively as "Acacia", unless there is a specific
need to separately refer to Summit as a distinct (albeit controlled) entity.

supposedly implemented the inventive feature of multiple logical connections.   When NetApp

pointed out that the Microsoft technology was licensed, Acacia admitted that it was wrong to

accuse computer systems with Microsoft products, but said that it would address the issue in its

rebuttal report.   The subsequent expert report did not include evidence of any unlicensed system,

however, as Acacia's own expert subsequently admitted.   There simply is no unlicensed system

with allegedly infringing technology that has been identified – despite a full opportunity for

Acacia to perform discovery.

Acacia tries to explain its improper double-dipping attempt with two excuses.  First, it

claims that the scope of the RPX license resulted from some unexplained "mutual mistake"

between it and RPX.  This is implausible, particularly because this multi-million dollar license

was drafted and heavily negotiated by two public companies whose core expertise includes

drafting licenses.  Even after admitting the scope of the RPX license, Acacia continued to

maintain this suit until it was faced with NetApp's summary judgment request, inflicting

additional inexcusable litigation expense on NetApp.  Second, Acacia argues that the burden is

on NetApp to show that the allegedly infringing systems in its expert reports are licensed.  Even

if that were correct, there are no actual systems identified in Acacia's expert report other than

those with Microsoft software – which is admittedly licensed.

In addition, Acacia never had a viable infringement claim against NetApp.   The claims

of the patents-in-suit require that the storage system does *not* use a "central file manager."

Acacia originally denied there was any such limitation, but ultimately acknowledged it during

the claim construction process.   NetApp's products unquestionably *use* a central file manager.

Perhaps worse, there is absolutely no evidence that NetApp acted with the wrongful intent

required for Acacia to prove inducement of infringement (the only claim in the case).  Given the

absence of merit to this case, there could not have been culpable purpose and none has been shown.

So why would Acacia assert these patents against so many companies if they were already licensed and not infringed?  Because Acacia knows that if it offers nuisance value settlements, in general, defendants facing the high cost of patent litigation will settle.   And that is what it did here, settling with six of the defendants for less than **REDACTED**    but bringing in nearly **REDACTED**        After two companies (NetApp and EMC) called Acacia's bluff by taking the matter all the way to expert discovery, when Acacia would have to prove its case to the Court, Acacia offered to dismiss the claims with prejudice at no cost as long as these last two parties would waive their right to seek fees and costs.   With litigation costs escalating as the case moved towards the trial phase, EMC ultimately succumbed to this offer.   NetApp did not. After NetApp submitted its summary judgment showing to this Court, Acacia chose not to respond, but unilaterally dismissed its case with prejudice, implicitly acknowledging its lack of merit.

Given the huge caseload of this Court, it would not be reasonable to expect it to systematically weed out meritless cases in the early stages through summary judgment.  This creates an environment where parties with meritless claims can use the cost of defense to pressure nuisance settlements.  To discourage such misuse of this Court, a party such as NetApp should be reimbursed for its litigation expense when it refuses to accede to meritless claims and a nuisance value settlement strategy by pursuing a meritless case to the summary judgment phase. Otherwise, there is little to keep the system in balance and to prevent parties such as Acacia from exploiting this Court's processes.

In sum, this is an exceptional case and NetApp should be reimbursed for the unnecessary litigation expenses it incurred standing up to Acacia.

## III.   STATEMENT OF FACTS

Acacia Research Group created Summit shortly before it initiated this case.  Summit was formed as a tool for the express purpose of extracting, through litigation, licensing revenue on the Acacia patents bought from a failed company, AMCC.  *See* Ex. 3[2] (April 13, 2012, 30(b)(6) Deposition of Dooyong Lee at 13:15-20); Ex. 4 (July 13,  2012 email from B. Harrison to B. Beebe).

Acacia operates through its made-for-litigation subsidiaries, such as Summit, tasked with monetizing Acacia patents, often through litigation – most of which settles outside of court.  Ex. 5 (2011 Acacia 10K at 4).  Acacia runs its subsidiaries out of its headquarters.  *See, e.g., Teleconference Sys. v. Proctor & Gamble Pharm., Inc.*, 676 F.Supp.2d 321, 332 (D.Del. 2009) ("Acacia, the patent and licensing company that collaborated with Margalla to enforce Margalla's patent against Cisco and its customers, is based in Newport Beach, California. Further, discovery has revealed that **plaintiff's senior officers are located in Acacia's California office, and that plaintiff's business is run out of the office**.") (emphasis supplied).  Acacia is a sophisticated licensing and litigation machine.  It has over 200 separate patent portfolios.  And it has executed over 1000 license agreements. Ex. 5 at 4. Reliance on heavy-handed litigation and below cost-of-defense settlements as a business model has resulted in problems for Acacia, however.  For example, it has been found that Acacia will engage in inadequate pre-suit investigations, rely upon one-size-fits-all infringement charts, and hide its lack of investigation behind improper claims of privilege.  These actions and Acacia's "shake-down approach to licensing

---

[2] Exhibits are to the Declaration of Edward Reines submitted herewith.

negotiations" have resulted in sanctions. *Micromesh Technology Corp. v. American Recreation Products, Inc.*, 2007 WL 2501783 at *3-8 (N.D. Cal., Aug. 30, 2007) (finding case exceptional and awarding attorneys' fees against an Acacia subsidiary).

Acacia asserted two patents here:   United States patents 7,392,291 and 7,428,581 (collectively the "asserted patents").  These patents relate to storage systems including a host computer and storage server, connected by a network and operating over multiple logical connections.  The supposed innovation is the concurrent use of multiple logical connections between the host and storage server.  The accused NetApp products are allegedly storage servers in the claimed networks and thus could not practice the asserted claims alone, making this purely an induced infringement case.

### A.   Prior To Filing This Case, Acacia Enters Into A Broad License With RPX Covering Dozens Of Companies

Acacia bought the asserted patents in February 2010. Ex. 6 (SDSL000024).  In March, Acacia licensed those patents to ~~REDACTED~~ .  In June, Acacia licensed them on a massive scale to RPX. Ex. 7 (SDSL0005146); Ex. 8 (SDSL0001645).  RPX is an entity that obtains patent licenses for its membership, which includes much of the computer industry.  The RPX agreement granted licenses to 43 companies, including  Microsoft,  **REDACTED**      Ex. 8 at SDSL0001679; Ex. 3 (Lee Deposition at 67:12-20).  These licenses expressly included all forms of indirect infringement involving any product of the licensed company.  Ex. 8 at SDSL0001646. Thus, when one of the 43 RPX companies makes a product that is used in a network practicing the asserted patents, the entire system is licensed, as Acacia readily admits.  Indeed, Acacia admitted that, under the RPX license, Microsoft products were licensed - making all the networks which included Microsoft products fully licensed. Ex. 9 (October 10, 2012 email from B. Harrison to B. Beebe).

5

Accordingly, prior to filing suit, Acacia had already broadly licensed the asserted patents

in a manner that would cover essentially all storage networks.   To be fully licensed, a storage

network would only need to include Microsoft software,                **REDACTED**

**REDACTED** (*or* a component from one of the other 40 companies specified in the RPX license).

### B.   Attempting To Double-Dip, Acacia Sues Storage Equipment Makers And Later Discloses The RPX License

On September 1, 2010, after it had broadly licensed its patent, Acacia filed a complaint

against eight makers of storage equipment Buffalo Technology (USA), Inc. ("Buffalo"), D-Link

Systems, Inc. ("D-Link"), EMC Corporation, ("EMC"), Fujitsu America, Inc. ("Fujitsu"),

Infortrend Corporation ("Infortrend"), Netgear, Inc. ("Netgear"), Qnap, Inc., ("Qnap"), and

NetApp.  (D.I. 1).  Acacia calculated that it could sue the storage device makers and collect

below cost of defense settlements, notwithstanding that the networks in which their equipment

would be used were already licensed under the confidential RPX agreement.   Although Acacia

brought the case in September 2010, it did not disclose the RPX settlement to the defendants

until April 2012.  It was marked as confidential under the Protective Order.

### C.   Even Leaving Aside Its Licensing Exhaustion Problem, Acacia's Infringement Theory Is Meritless From The Start

From the start, a central dispute in this case was whether the patents-in-suit could cover

storage devices that use a "central file manager."   NetApp's devices are famous for their

proprietary WAFL central file manager. Accordingly, one of the parties' core claim construction

disputes involved whether the key claim term "storage server" was limited to servers that *did not*

*use* a central file manager or whether, as Acacia proposed, there was no such limitation at all.

(D.I. 127 at 2 ("'storage server':  'a device or computer system that receives, stores, and provides

data'")).  Acacia disputed that any limitations on the storage server were required.  (D.I. 130 at

3).  During the claim construction process, however, Acacia finally agreed that the storage server

6

must operate "without the use of a central file manager" and the Court adopted that construction. (D.I. 152 at 2).

Conceding that a storage server must operate *without* the use of a central file manager doomed Acacia's infringement case against NetApp. As NetApp explained in requesting leave to move for summary judgment, Acacia's infringement expert conceded, as he had to, that NetApp's filers have a central file manager in WAFL and that this proprietary central file manager is used identically in all data storage situations. (D.I. 223 at 4). Further, Acacia's expert conceded that no system implementing "NAS" capabilities, as all NetApp filers do, qualifies as a storage server under the court's construction. (D.I. 223 at 4).

Acacia was aware of this problem from much earlier in the case. In April 2012, NetApp reminded Acacia that no NetApp product operated without the use of a central file manager. Ex. 10 (April 4, 2012 email from B. Beebe to B. Harrison). And in May, NetApp reminded Acacia that the Court's construction "exclude[s] all NetApp products." Ex. 11 (May 14, 2012 email from B. Beebe to B. Harrison). Acacia never responded to either of these notices.

### D.     Acacia Settles Claims For Nuisance Value

After claim construction, but before producing any documents, Acacia began aggressively entering into nuisance value settlements. The high cost of patent litigation is well known. *Ohio Willow Wood Co. v. Thermo-Ply, Inc.*, 629 F.3d 1374, 1376-77 (Fed. Cir. 2011) (Moore, J., concurring) ("Patent litigations are among the longest, most time-consuming types of civil actions. . . . Moreover, the costs of patent litigation are enormous with an average patent case costing upwards of $3 million for each side.").

Acacia dismissed Hitachi for REDACTED (D.I. 149; Ex. 12 (SDSL0001714), D-Link for REDACTED (D.I. 151; Ex. 13 (SDSL0001701), and Buffalo for REDACTED (D.I. 167; Ex. 14 (SDSL0001690). Two additional defendants held out until near the close of fact discovery.

7

Acacia dismissed Infortrend then for _REDACTED_ (D.I. 206; Ex. 15 (SDSL0005170) and Qnap for **REDACTED** (D.I. 213; Ex. 16 (SDSL0012249). By expert discovery, only NetApp and EMC remained.[3]  Each of the other defendants had been dismissed for less than _REDACTED_ or for free by joining RPX, far less than any reasonable cost of litigation.

As the case proceeded toward trial, EMC, which apparently refused to pay any nuisance money, was dismissed from the case for free on the condition that it would not seek fees and costs.  (D.I. 232 at 2 n.1; D.I. 222).  NetApp was offered the same deal, but refused because it was determined to seek reimbursement of its fees and costs.

### E.      Acacia's Infringement Theories Are Proven To Be Baseless

Acacia served its opening expert report on infringement on August 31, 2012.  For the first time in this case, Acacia meaningfully identified its infringement theory.  Acacia's expert claimed that NetApp induced infringement by encouraging the use of systems "using the iSCSI protocol and MCS form of multiple connections."  Ex. 19 (August 31, 2012 Report of Myron Zimmerman at 21).  This was the first time Microsoft's MCS technology was identified as the accused functionality and the first time Acacia identified any functionality related to the creation of multiple logical connections.  Importantly, Microsoft's MCS software feature was the only accused technology identified by Acacia.  Ex. 19 (August 31, 2012 Report of Myron Zimmerman at 11).

### 1.      Acacia Concedes The Accused Products Are Licensed

Upon receipt of Acacia's expert report, NetApp immediately objected that Acacia was attempting to double dip by collecting royalties on already licensed products.  Ex. 20 (October 5, 2012 email from B. Beebe to B. Harrison).  NetApp identified the Microsoft license under the

---

[3] Defendants Fujitsu and Netgear both avoided litigation by joining RPX, thereby paying nothing directly to Acacia.  Ex. 17 (SDSL0001631); Ex. 18 (SDSL00001628).

RPX agreement and explained that no product sold by NetApp can infringe when using

Microsoft software because Acacia's rights are exhausted and impliedly licensed based on

Microsoft's RPX license.  Ex. 20.  Acacia acknowledged this problem, stating that "[w]e concur

in your interpretation of the license agreement" and promising that the issue would be addressed

in "future expert report(s)."  Ex. 9 (October 10, 2012 email from B. Harrison to B. Beebe).

        2.      Acacia Fails To Identify Any Unlicensed Systems That Allegedly Infringe

Acacia's "future expert reports" failed to identify a single unlicensed system.  In a seven-

page supplemental report, Acacia spent only two pages addressing its mistake in accusing

licensed systems.  In its scramble to claim that someone, somewhere infringes the asserted

patents using a NetApp filer, Acacia pointed to its infringement contentions, containing the

results of its supposed pre-suit investigation.  Ex. 21 (October 12, 2012 Report of Myron

Zimmerman at 5).  Acacia's supplemental report failed to note that the host computer in the

infringement contentions was again running Microsoft Windows, and was thus also licensed.

Ex. 22 (April 12, 2012 Responses and Objections to NetApp, Inc.'s First Set of Interrogatories

(Nos. 1-6)); Ex. 23 (November 14, 2012 Deposition of Myron Zimmerman at 26:5-12).

No actual infringing system was identified, and no use of software, other than the

Microsoft Initiator for utilizing MCS, was ever alleged to infringe with evidence.

        3.      Acacia's Expert Admits He Made A Big Mistake

Acacia's expert admitted at his deposition that he made a "big mistake" by not inquiring

into the licensing issues that precluded infringement.  Ex. 23 (Zimmerman Deposition at 86:9-

14).  And, despite Acacia's hand-waving claims that someone must infringe, its expert admitted

that, even after being notified of the Microsoft license, he made no attempt to analyze any other

system for infringement.  Ex. 23 (Zimmerman Deposition at 103:10-20; 109:16-24).

4.     Acacia Attempts To Back Out Of The Litigation And Hide Its Conduct

Knowing that its expert could not defend its positions, Acacia attempted to back out of

the litigation.  As noted, Acacia walked away from its claims against EMC, dismissing them with

prejudice on November 9, 2012, shortly before the deposition of its expert.  (D.I. 222).

NetApp, refusing to abandon its fee claim, sought leave to move for summary judgment

pursuant to the Court's scheduling order.  (D.I. 223).  When Acacia's response to NetApp's

request to file for summary judgment came due, on December 14, 2012, Acacia had no answer.

Instead it moved to dismiss its own infringement claims with prejudice, but it silently included

an unsupported provision in its form of order that NetApp would be precluded from seeking fees

and costs.  (D.I. 228).  NetApp promptly responded, informing the Court of what Acacia was

attempting to do.  (D.I. 229).  In a telephonic hearing on January 10, 2013, the Court resolved

the issue, clearly confirming that Acacia's claims would be dismissed with prejudice and that

NetApp would have its statutory right to seek its fees and costs.

## IV.    THIS IS AN EXCEPTIONAL CASE AND NETAPP SHOULD BE REIMBURSED ITS ATTORNEYS' FEES

Pursuant to 35 U.S.C. § 285, a "court in exceptional cases may award reasonable attorney

fees to the prevailing party."  A case is exceptional where there is litigation misconduct or where

it is shown both that "(1) the litigation is brought in subjective bad faith, and (2) the litigation is

objectively baseless." *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1370

(Fed. Cir. 2012).  Examples include cases with "misconduct during the litigation, vexatious or

unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like

infractions." *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 916 (Fed. Cir. 2012).

A case is objectively unreasonable when "no reasonable litigant could reasonably expect

success on the merits." *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1309

10

(Fed. Cir. 2012). It is subjectively unreasonable when the "lack of objective foundation for the claim 'was either known or so obvious that it should have been known.'" *Id.* Both inquiries consider the full scope of the litigation, not just what was known at the time of filing, to determine whether the case as a whole is exceptional. *Id.* at 1310-11.

As demonstrated below, this case is exceptional such that the prevailing party, NetApp, should be reimbursed for its fees and costs. Acacia's case is baseless for two independent reasons. First, Acacia was unable to identify even one unlicensed accused system. Second, Acacia never had a viable infringement theory. In addition, Acacia's attempt to double-dip and to extract nuisance value settlements confirms this case was litigated in bad faith.

### A.    NetApp Is The Prevailing Party

Acacia's patent infringement claim against NetApp has been dismissed with prejudice at its request, with the condition that NetApp is authorized by this Court to file this motion seeking fees and costs. (D.I. 235). *See Inland Steel Co. v. LTV Steel Co.*, 364 F.3d 1318, 1320-21 (Fed. Cir. 2004). This Court's Local Rules confirm NetApp's "prevailing party" status, explaining that the "defendant is the prevailing party upon a dismissal or summary judgment or other termination of the case without judgment for the plaintiff on the merits." D.Del. LR 54.1(c).

### B.    This Case Is Objectively Baseless

This case has been objectively baseless from the moment it was filed. Despite two years of litigation, extensive discovery, and multiple expert reports, Acacia has not identified a single system to accuse that was not licensed before this litigation began, nor has it had a viable infringement theory.

#### 1.    Acacia Had No Basis To Allege Infringement

It is axiomatic that to prove induced infringement, there must be at least one example of direct infringement. *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed.

11

Cir. 1986) ("Absent direct infringement of the patent claims, there can be neither contributory infringement nor inducement of infringement.") (citations omitted). Acacia's infringement contentions, consisting of the complete results of its pre-suit investigation, relied on a system using a host computer running *Microsoft* software. Ex. 23 (Zimmerman Deposition at 88:16-21). Likewise, Acacia's expert reports accused only systems running *Microsoft* software. Ex. 23 (Zimmerman Deposition at 71:21-24); Ex. 19 (August 31, 2012 Report of Myron Zimmerman at 11, 21). These systems were licensed before Acacia filed suit.

Despite these facts, Acacia's expert admitted in deposition that he never investigated whether any other system practiced the asserted patents, even after being informed that his entire theory of infringement was predicated on licensed activity. Ex. 23 (Zimmerman Deposition at 103:10-20; 109:16-24). Acacia's expert also admitted that he made a "big mistake" by asserting that licensed systems infringed in his original report and failing to ask if others were licensed. Ex. 23 (Zimmerman Deposition at 86:9-14 ("Q Did you ask Summit, did you say are there any other licenses I need to worry about since I already made a big mistake? A I should have. Q But you didn't do that, did you? A Right.")) Because so many network components were licensed, Summit's expert also admitted he was **unable to find any infringing system** involving NetApp equipment:

> Q But you're definitely not aware of any actual system that -- for which NetApp induced infringement, any actual configuration?
> A I have not run tests myself.
> Q But forget the run tests. All your analysis, with all the discovery that you get in a federal case, anything on the Internet, you've never been able to find one system in NetApp that is an infringing system?
> A I have not done that analysis.

12

Ex. 23 (Zimmerman Deposition at 109:16-24; *see also* 103:10-20 (admitting there is no evidence

regarding UNIX and Linux systems).  When pressed on why he failed to identify an infringing

system, Summit's expert claimed as an excuse that he ran out of time:

> Q And then the reason why you couldn't put in an opinion on UNIX or Linux that
> had the evidentiary support in your reply was it came up at the last minute and
> you just didn't have time? I think that's what you said.
> A Yeah, I did -- I did not perform that analysis.
> Q And that's because you didn't have time?
> A It was -- yeah, I didn't have time.

Ex. 23 (Zimmerman Deposition at 110:7-15).  To attempt to backfill, Acacia has half-heartedly

suggested there may be some system somewhere, running UNIX or Linux, that does not include

equipment from the 40 plus RPX licensees.  As the testimony from Acacia's expert above

proves, he had no such UNIX or Linux opinion.  Moreover, Acacia hid the factual testing

evidence underlying its infringement contentions as privileged and withheld its theories

generally until filing its expert reports.  Ex. 24 (June 6, 2012 Deposition of Fahim Aftab at

111:2-10).  At the time it filed this lawsuit, Acacia was aware of no infringing use and, despite

substantial discovery, never found one.  Its pre-suit investigation was thus improper and its

litigation conduct vexatious.

### 2.   Acacia Advanced Fatally Flawed Infringement Positions

NetApp's products are well-known for their WAFL file system, which is a central file

manager.  Although Acacia initially denied that the claims were limited to systems which do not

use a central file manager, during the claim construction process, it abandoned that unsupported

position.  Specifically, Acacia conceded that a "storage server" must "operate without the use of

a central file manager." (D.I. 152 at 2).  Acacia's technical expert conceded that none of

NetApp's filers operated without the use of a central file manager.; Ex. 23 (Zimmerman

Deposition at 39:22-40:2) ("Q Okay.  I am – right now I'm just talking about the NAS

implementation you don't dispute that WAFL includes a central file manager, in the NAS aspect? A Correct."); 43:5-14 ("Q And you understand that in terms of how the NetApp accused products work, that they use WAFL whether they're in a SAN mode or a NAS mode? A They're using the same underlying capability, yes. Q Right. And they're using – when you say 'the same underlying capability,' they're using root inode, inode files, regular file and direct blocks, regular file data blocks? A Correct.")). Yet Acacia pressed on by straining to re-construe the settled claim term in order to argue that the storage server can somehow be segregated into practicing and non-practicing halves. It did so even though its expert never identified any teaching in the patents, or actual, existing NetApp software that would support this theory. Ex. 21 (October 12, 2012 Report of Myron Zimmerman at 3-4). The pursuit of objectively baseless infringement claims, through improper claim construction arguments and unreliable expert testimony, marks an exceptional case. *MarcTec*, 664 F.3d at 918-19. Moreover, Acacia's concession as to the meaning of the claim term confirms that "no reasonable litigant could believe [Acacia's argument] would succeed." *Raylon*, 700 F.3d at 1368.

On top of this, Acacia had no way to prove that NetApp possessed the necessary bad intent required to prove inducement; especially given the baseless nature of the infringement theory. *GlobalTech Appliances, Inc. v. SEB*, 131 S.Ct. 2060, 2068 (2011) ("Accordingly, we now hold that induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement."). Acacia argues that NetApp's purpose to cause patent infringement can be demonstrated merely by providing customers with user documents prepared before knowing of the patents that, if followed, may result in infringement. (D.I. 232 at 8-9). This position simply ignores the holding in *GlobalTech* that there must be a culpable purpose to encourage the breaking of the patent law that exceeds recklessness. *GlobalTech*, 131 S.Ct. at

14

2070. Acacia has not cited and cannot find any evidence to support its claim of induced infringement.

3.    <u>Acacia Refused To Defend Its Litigation Positions On The Merits</u>

As soon as permitted by the Court's Scheduling Order, NetApp requested leave to seek summary judgment on three issues: (1) Acacia's efforts to obtain damages on previously licensed products; (2) its failure to demonstrate infringement under the Court's construction of "storage server;" and (3) its inability to show the bad purpose necessary to prove induced infringement. (D.I. 223). Obligated to explain to this Court the basis for its positions, Acacia instead conceded its case by moving to dismiss its claims with prejudice, rather than responding to the summary judgment request. (D.I. 228). Acacia abdicated its chance to respond on the merits, which on this record effectively concedes that its position was meritless

**C.   Acacia's Subjective Bad Faith In Pursuing Its Claims Makes This Case Exceptional**

Acacia's conduct exemplifies bad faith litigation. Bad faith exists when the unreasonableness of the asserted claims is "either known or so obvious that it should have been known" by the patentee. *Highmark*, 687 F.3d at 1312. It has been described as "closely aligned with a finding of unfairness" and noted that "it is unreasonable minds that go to extraordinary lengths to conjure and advance through various stages of a legal proceeding unsupported arguments that are also inconsistent with established precedent in order to accuse non-infringing devices." *Raylon*, 700 F.3d at 1374 (Reyna, J., concurring). And it exists when a party is found "exploiting the high cost to defend complex litigation to extract a nuisance value settlement." *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1327 (Fed. Cir. 2011).

15

1.   Acacia Knew Or Should Have Known That Its Positions Were
     Unreasonable

Acacia knew of the RPX license, having negotiated and signed the agreement.  Yet,

Acacia accused and collected settlements on licensed products.  And it accused NetApp of

infringement by use of licensed Microsoft software.  Acacia is a sophisticated public company.

A central function of its business is to negotiate and draft exactly these kinds of agreements.

Acacia implausibly suggests that there was some unidentified "mutual mistake" that caused it not

to know the scope of the license it had granted to RPX's membership.  (DI 232 at 2).  As

demonstrated above, Acacia's expert had two opportunities to identify an infringing system, but

failed to do so.  The willful collection of settlement payments on licensed products and decision

to proceed in light of such obvious facts demonstrates bad faith and renders this case exceptional.

*Highmark*, 687 F.3d at 1312-13; *PSC Inc. v. Symbol Techs., Inc.*, 26 F.Supp.2d 505, 511

(W.D.N.Y. 1998) (finding attempts to collect double royalties constitute patent misuse).

Acacia has attempted to justify its actions by arguing that the Microsoft license covers

"slightly less than 50% of the market" and thus "does not leave . . . Summit with no basis upon

which to proceed to trial."  (D.I. 232 at 2).  Putting aside that Acacia licensed not only Microsoft,

but 42 other companies, and that Acacia never identified a single instance of direct infringement,

its argument resolves to the claim that a broad market survey shows there must be infringement.

This argument has been rejected both substantively, *Acco Brands, Inc. v. ABA Locks*

*Manufacturers Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007), and as an excuse for an objectively

unreasonable position. *Highmark*, 687 F.3d at 1313.   Moreover, Acacia's expert admitted that

he could not identify any unlicensed system.  Ex. 23 (Zimmerman Deposition at 84:10-23) ("Q

Right.  So basically you have no idea whether there's a NetApp system out there that's an

infringing configuration, isn't that right, if you're going to be honest about it?  A Well, I've –

16

MR. HOSKYN:  Object to form.  THE WITNESS – not done any analysis so I'm not sure how

to answer that."); 109:16-24 (Q But you're definitely not aware of any actual system that – for

which NetApp induced infringement, any actual configuration?  A I have not run tests myself.  Q

But forget the run tests.  All your analysis, with all the discovery that you get in a federal case,

anything on the Internet, you've never been able to find one system in NetApp that is an

infringing system?  A I have not done that analysis.").

In addition to engaging in improper licensing activities, Acacia pursued an infringement

theory it knew to be unreasonable.  After originally contending that the use of a central file

manager was not relevant to the meaning of a "storage server," Summit ultimately stipulated to a

construction that precluded it from proving infringement.  (D.I. 152 at 2).  Yet, even after it was

informed that NetApp's well-known use of WAFL in all of its products excluded them from

infringing, Summit refused to acknowledge the flaws in its case, choosing instead to argue a new

and unsupported analysis of the construction.  (D.I. 232 at 7); *MarcTec*, 664 F.3d at 920 (finding

litigation misconduct based in part on the plaintiff's "decision to advance frivolous and

unsupported allegations of infringement premised on mischaracterizations of the claim

constructions adopted by the trial court").

Finally, although Acacia styled this an inducement case, it never had proof of the

necessary bad purpose -- nor any reason to believe it would be able to prove it.

        2.    Acacia Exploited The High Cost Of Defending Patent Claims

Acacia's settlements in this case ranged between        **REDACTED**       EMC was

dismissed on Acacia's heavy-handed condition that EMC drop its request for reimbursement of

fees and costs.  Acacia's tactics caused NetApp to spend over $1,000,000 in its defense while

Acacia regularly settled for less than      REDACTED     of the likely litigation costs.  Such nuisance

settlements are a signpost of the exact conduct found by the Federal Circuit to evidence bad

17

faith. *Eon-Net*, 653 F.3d at 1327 ("Thus, those low settlement offers – less than ten percent of the cost that [the defendant] expended to defend suit – effectively ensured that [the plaintiff's] baseless infringement allegations remained unexposed, allowing [plaintiff] to continue to collect additional nuisance value settlements.").

Indeed, this case shares many similarities with *Eon-Net*, where the Federal Court found that regular settlements for nuisance value showed bad faith. Here, as there, Acacia is a non-practicing entity, immune to most counterclaims and bearing little business risk in litigation. *Id.* at 1327-28. Here, as there, Acacia imposed disproportionate costs on NetApp by expanding the scope of discovery with little reciprocal risk. *Id.* at 1327. And here, as there, Acacia runs volume operations, filing against many defendants and settling for small sums. *Id.* at 1327. Thus, this case, with its untenable merits and small settlements, has the same "indicia of extortion" found in *Eon-Net* which warrants relief. *Id.* at 1326.

## V.    NETAPP'S FEES ARE REASONABLE AND SHOULD BE AWARDED

"The methodology of assessing a reasonable award under 35 U.S.C. § 285 is within the discretion of the district court." *Mathis v. Spears*, 857 F.2d 749, 754 (Fed. Cir. 1988) (*citing Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1068 (Fed. Cir. 1983)). Where a prevailing party "has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation." Id. at 755 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) (internal quotation marks omitted)).

In this case, as detailed above, NetApp has uncovered a flawed and baseless litigation that should never have been filed and certainly never should have required a request for summary judgment to conclude. Indeed, this case has the indicia of an exceptional case:  a non-practicing entity that litigates for nuisance value settlements; denial of critical facts that should terminate the litigation but are ignored, thus driving up litigation costs; improper licensing

18

activities through double-dipping on previously licensed products; and attempts to hide these actions.

NetApp therefore requests the Court enter an order requiring Acacia to reimburse NetApp for its reasonable attorneys' fees in the amount of $1,160,621.95, plus those fees incurred and paid by NetApp through the conclusion of this motion.  Decl. of E. Reines at ¶ 5-6, 10-15.  Because Acacia's litigation was unfounded from the start, the full scope of NetApp's fees was necessarily and reasonably incurred in the defense of this action and this case was handled with appropriate diligence and concern for costs and efficiencies.  Decl. of E. Reines at ¶ 8.  In addition, the billing rates charged are reasonable for patent litigation counsel in Delaware and nationally.  Decl. of E. Reines at ¶ 16.  In fact, due to the efforts of the joint defense group, the total fees incurred on behalf of NetApp are significantly below the average fees necessary to litigate a case of this nature through expert discovery over the course of more than two years.  Decl. of E. Reines at ¶ 8.

In addition, NetApp incurred $234,892.67 in expert costs.  Decl. of E. Reines at ¶ 7.  Such costs may be awarded pursuant to the Court's inherent authority when there has been an abuse of the judicial process.  *Takeda Chemical Industries, Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008) (explaining that "courts may use sanctions in cases involving bad faith that cannot be otherwise reached by rules or statutes").  In light of Summit's conduct in this matter, the award of these costs is appropriate to fully compensate NetApp for the undue expense of litigating a baseless and vexatious case.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B Blumenfeld*

_____
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
mflynn@mnat.com

*Attorneys for Defendant NetApp, Inc.*

OF COUNSEL:

Edward R. Reines
Byron C. Beebe
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

January 29, 2013

6975613

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2013, I caused the foregoing to be

electronically filed with the Clerk of the Court using CM/ECF, which will send notification of

such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on

February 5, 2013, upon the following in the manner indicated:

Neal C. Belgam, Esquire                                          *VIA ELECTRONIC MAIL*
Melissa N. Donimirski, Esquire
PROCTOR HEYMAN, LLP
300 Delaware Avenue, Suite 200
Wilmington, DE  19801
*Attorneys for Plaintiff*

Bryan G. Harrison, Esquire                                      *VIA ELECTRONIC MAIL*
John P. Fry, Esquire
W. Andrew McNeil, Esquire
MORRIS, MANNING & MARTIN, LLP
1600 Peachtree Road, N.E.
Atlanta, GA  30326
*Attorneys for Plaintiff*

                                        */s/ Michael J. Flynn*
                                        _____
                                        Michael J. Flynn (#5333)