# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SUMMIT DATA SYSTEMS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.             ) | C.A. No. 10-749-GMS |
| ) | |
| EMC CORPORATION, BUFFALO ) | |
| TECHNOLOGY (USA), INC., D-LINK ) | |
| SYSTEMS, INC., HITACHI DATA ) | |
| SYSTEMS CORPORATION, ) | |
| INFORTREND CORPORATION, NETAPP, ) | |
| INC., NETGEAR, INC. and QNAP, INC., ) | |
| ) | |
| Defendants. ) | |

**BRIEF OF *AMICUS CURIAE* CITRIX SYSTEMS, INC., HTC CORPORATION, LIMELIGHT NETWORKS, INC., NEWEGG INC., RACKSPACE HOSTING, INC., SAFEWAY INC., AND SAS INSTITUTE INC., IN SUPPORT OF DEFENDANT <u>NETAPP, INC.'S MOTION FOR ATTORNEYS' FEES AND COSTS</u>**

|  |  |
|---|---|
|  | John W. Shaw (No. 3362) |
| OF COUNSEL: | SHAW KELLER LLP |
| Steven D. Moore | 300 Delaware Avenue, Suite 1120 |
| KILPATRICK TOWNSEND & STOCKTON LLP | Wilmington, DE 19801 |
| Eighth Floor, Two Embarcadero Center | (302) 298-0700 |
| San Francisco, CA 94111 | jshaw@shawkeller.com |
| (415) 273-4741 | *Attorneys for Amicus Curiae* |

Dated: August 13, 2013

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

I. NATURE AND STAGE OF PROCEEDINGS ................................................................ 1

II. SUMMARY OF ARGUMENT ....................................................................................... 1

III. FACTS ............................................................................................................................. 1

IV. ARGUMENT ................................................................................................................... 2

V. CONCLUSION ................................................................................................................ 6

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                     **Page**

*Eon-Net LP et al. v. Flagstar Bancorp*,
    653 F.3d 1314 (Fed. Cir. 2011)......................................................................................5

*Highmark Inc. v. Allcare Health Management Sys. Inc.*,
    687 F.3d 1300 (Fed. Cir. 2012)......................................................................................5

*MarcTec LLC v. Johnson & Johnson*,
    664 F.3d 907 (Fed. Cir. 2012)........................................................................................5

*Raylon v. Complus Data Innovations, Inc.*,
    Nos. 2011–1355, 2011–1356, 2011–1357, 2011–1358, 2011–1359
    --- F.3d ----, 2012 WL 6062504 (Fed. Cir. Dec. 7, 2012).............................................5

**Statutes**
35 U.S.C. § 285..............................................................................................................1, 5, 6

**Other Authorities**
Fed. R. Civ. P. 11................................................................................................................5, 6

I.    **NATURE AND STAGE OF PROCEEDINGS**

*Amicus Curiae* Citrix Systems, Inc., HTC Corporation, Limelight Networks, Inc., Newegg Inc., Rackspace Hosting, Inc., SAS Institute Inc., and Safeway Inc. (collectively "*Amici*") file this *Amicus Curiae* Brief in Support of the Motion for Attorneys' Fees and Costs filed by Defendant NetApp, Inc. in this matter (D.I. 236).

II.    **SUMMARY OF ARGUMENT**

Plaintiffs Summit Data Systems LLC and Acacia Research Group's (collectively, "Acacia's") behavior in this litigation illustrates the need for fee awards in baseless patent cases. It is the very reason that the need to deal with frivolous patent litigation is getting attention today in the Executive and Legislative branches, as well as the popular media. For the same underlying policy and legal reasons, this Court should hold that Acacia's decision to maintain this action – despite having previously licensed the patents in suit – was a bad-faith effort to extort settlement money to which it was not entitled. Acacia's conduct renders this an exceptional case under 35 U.S.C. § 285, as well as similar provisions in Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927. Accordingly, NetApp's Motion for Attorneys' Fees and Costs should be granted.

III.    **FACTS**

The facts relevant to NetApp's motion have been laid out in NetApp, Inc.'s Opening Brief in Support of its Motion for Attorneys' Fees and Costs (D.I. 240); for brevity, *Amici* incorporate these facts by reference, and re-emphasize only those most critical facts regarding Acadia's conduct, as follows. Acacia, the publicly held patent licensing company that is the parent of Plaintiff Summit Data Systems LLC ("Summit"), licensed the patents-in-suit for the very technologies that Summit accused NetApp and others of infringing. Even though Acacia never identified any unlicensed infringing technology that NetApp used, it maintained this suit

1

despite its license, and used the threat of mounting defense costs to obtain settlements from other Defendants who might also have been licensed. NetApp was the lone Defendant who refused to settle, and Acacia then realized it had been caught asserting licensed patents and sought to abandon its case in exchange for a promise that NetApp would not seek attorneys' fees. Unwilling to reward Acacia for its wrongful behavior, NetApp brought its motion to recover its fees and costs.

*Amici* are all companies who were subjected to patent cases that lack any merit, and who have been burdened by the high cost of patent litigation defense. *Amici* regularly are faced with settlement demands by patent trolls in meritless patent litigation that present the Hobson's choice of either paying defense costs to fight the case, or paying less than defense costs to settle the case. Thus, *amici* have an interest in ensuring that where, as here, patent trolls assert baseless claims, there are repercussions for doing so, and such patent trolls are not rewarded by being able to settle baseless claims for less than the costs of defense.

## IV.   ARGUMENT

The need to sanction meritless patent litigation is especially acute in the case of non-practicing entities – more colloquially referred to as "patent trolls." Acacia is one such entity, as its sole business model is to file lawsuits asserting patents it neither invented nor practices. Acacia's actions are clear examples of the activities that President Obama recently remarked on when discussing the need to reduce the impact of baseless patent litigation by non-practicing entities on this country's economy: "The folks that you're talking about are a classic example. They don't actually produce anything themselves. They're just trying to essentially leverage and hijack somebody else's idea and see if they can extort some money out of them." Barack

Obama, United States President, Fireside Hangout on Google+ (Feb. 14, 2013), http://www.youtube.com/watch?v=kp_zigxMS-Y.[1]

Congress also has devoted its energy to remedying these problems by, among other things, ensuring that patent trolls whose cases lack any merit be required to pay their opponent's fees and costs of litigation. *See* Saving High-Tech Innovators from Egregious Legal Disputes Act of 2013, H.R. 845 113th Cong. (2013) (allowing fee shifting and earlier movement for judgment in some patent defenses), Patent Abuse and Reduction Act of 2013, S. 1013, 113th Cong. (2013) (requiring heightened pleading, addressing asymmetry in discovery by requiring parties to pay for anything beyond core documents, and including a fee shifting provision that awards costs and expenses including fees to the prevailing party unless the loser's position was substantially justified or exceptional circumstances make the reward unjust), and Patent Litigation and Innovation Act of 2013, H.R. 2639, 113th Cong. (2013) (adding procedural requirements to patent suits).

Further, Chief Judge Rader of the U. S. Court of Appeals for the Federal Circuit warned against the same dangers in a recent newspaper editorial:

> The onslaught of litigation brought by "patent trolls" — who typically buy up a slew of patents, then sue anyone and everyone who might be using or selling the claimed inventions — has slowed the development of new products, increased costs for businesses and consumers, and clogged our judicial system.

Chief Judge Randall R. Rader, Colleen Chien & David Hricik, *Make Patent Trolls Pay in Court*, NYTIMES.COM (June 4, 2013) (attached as Exhibit 1).

---

[1] The White House more recently formalized these comments with legislative recommendations to allow more discretion in fee shifting, and executive orders to create greater transparency in the patent system. *See FACT SHEET: White House Task Force on High-Tech Patent Issues*, WHITEHOUSE.GOV (June 4, 2013), http://www.whitehouse.gov/the-press-office/2013/06/04/fact-sheet-white-house-task-force-high-tech-patent-issues (last accessed August 12, 2013).

As noted more fully in NetApp's Briefs, Acacia is a public company devoted to nothing but buying and asserting patents. It asserts those patents by frequently using the cost of litigation as leverage to obtain settlements from multiple defendants. Acacia followed that same formula here: even though it had received money from RPX to license the patents-in-suit, Acacia proceeded to endeavor to get more settlement money from targets already covered by the RPX license. To do so, Acacia ignored that the license might cover the very systems accused of infringement and continued to litigate this case and obtain settlements despite the license it had granted to NetApp and likely other Defendants as well.

Acacia's actions here are identical to one of the examples of abusive litigation that Chief Judge Rader identified: "Other indications of potential bullying include litigants who assert a patent claim when the rights to it have already been granted through license. . ." Rader et al., *Make Patent Trolls Pay in Court*. That is exactly what happened in this case, as NetApp's briefs persuasively prove. *See Summit Data Sys. v. NetApp*, No. 10-749, D.I. 240 (NetApp, Inc.'s Opening Brief in Support of Its Motion for Attorneys' Fees and Costs) at 11-16 (D. Del. Feb. 5, 2013); *id.* at D.I. 247 (NetApp, Inc.'s Reply Brief in Support of Its Motion for Attorneys' Fees and Costs) (D. Del. Mar. 4, 2013).

It is fundamentally unfair for Acacia to be able to take such actions without any fear of repercussions. Again, as Chief Judge Rader recognized, it has no downside for doing so:

> With huge advantages in cost and risk, trolls can afford to file patent-infringement lawsuits that have just a slim chance of success. When they lose a case, after all, they are typically out little more than their own court-filing fees.

*See* Ex. 1.

This problem is exacerbated by the explosion in patent litigation across the country, particularly since the filing of the America Invents Act, and particularly in this District. Here, from 2003 to 2012, there has been nearly a six-fold increase in the number of patent cases filed

each year, from 135 to 809. Moreover, patent cases represented 48% of the total civil docket in 2012, up from 7% in 2003. *See* 2013 Annual Report, U.S. District Court for the District of Delaware, at 10 (attached as Exhibit 2). With so many patent cases per judge (more than 200 per authorized judgeship in 2012, *id.*), it becomes very difficult for Courts to sort out the frivolous cases from the meritorious ones. Patent trolls such as Acacia thus become emboldened, knowing that the crush of the Court's docket will make it difficult for even the weakest case to be dealt with expeditiously, and banking on this fact to wrangle more settlements out of Defendants who do not wish to pay the high costs of defense in cases such as this.

Fortunately, as Chief Judge Rader also recognized, the law gives this Court tools to deal with abuses such as this case, where Acacia effectively has admitted its claims never had any merit by dismissing them with prejudice: "[J]udges already have the authority to curtail these practices: they can make trolls pay for abusive litigation." *See* Ex. 1 (referencing 35 U.S.C. § 285 and Fed. R. Civ. P. 11 as providing support for such judicial discretion).

Indeed, the Federal Circuit has consistently endorsed using those tools to punish patent litigation that plaintiffs bring or maintain without good faith basis to do so. *See, e.g., Raylon v. Complus Data Innovations, Inc.*, Nos. 2011–1355, 2011–1356, 2011–1357, 2011–1358, 2011–1359, --- F.3d ----, 2012 WL 6062504 (Fed. Cir. Dec. 7, 2012) (reversing district court's denial of sanctions under § 285 where plaintiff's infringement claim was baseless); *Highmark Inc. v. Allcare Health Management Sys. Inc.*, 687 F.3d 1300 (Fed. Cir. 2012) (affirming sanctions award under § 285); *MarcTec LLC v. Johnson & Johnson*, 664 F.3d 907 (Fed. Cir. 2012) (same); *Eon-Net LP et al. v. Flagstar Bancorp*, 653 F.3d 1314 (Fed. Cir. 2011) (affirming sanctions award where plaintiff, like Acacia here, maintained a baseless suit solely in an effort to leverage costs of defense into monetary settlement).

5

Using that precedent, along with 35 U.S.C. § 285 and Fed. R. Civ. P. 11, this Court should not condone Acacia's playing fast and loose with the litigation process. It should hold that NetApp is entitled to recover its fees and costs of litigation because, as described in NetApp's briefs:

- Upon signing the RPX license, Acacia should have disclosed the license and affirmatively notified the Defendants that any licensed products were not at issue.

- By sticking its head in the sand, Acacia reaped benefits of additional settlements, and caused companies such as NetApp to spend over a million dollars in defense costs on claims that were already licensed.

- Acacia continues to blame NetApp for not discovering the issue Acacia hid, claiming that since license is an affirmative defense, it is perfectly justified for Acacia to hide the RPX license and hope that Defendants such as NetApp settle before they realize they are licensed. This argument defies the law and common sense. Acacia is under a duty to litigate in good faith, and asserting claims to licensed patents in the hopes of leveraging the costs of defense into further settlement payments breaches that duty.

As a result of Acacia's malfeasance, this Court should hold that this is an exceptional case and a violation of Rule 11, and should award NetApp its fees and costs incurred in this action.

## V. CONCLUSION

For the foregoing reasons, NetApp's Motion for Attorneys' Fees and Costs should be granted.

| | |
|---|---|
| OF COUNSEL:<br>Steven D. Moore<br>KILPATRICK TOWNSEND & STOCKTON LLP<br>Eighth Floor, Two Embarcadero Center<br>San Francisco, CA 94111<br>(415) 273-4741<br><br>Dated: August 13, 2013 | Respectfully submitted,<br><br>*/s/ John W. Shaw*<br>John W. Shaw (No. 3362)<br>SHAW KELLER LLP<br>300 Delaware Avenue, Suite 1120<br>Wilmington, DE 19801<br>(302) 298-0700<br>jshaw@shawkeller.com<br>*Attorneys for Amicus Curiae* |

# **<u>EXHIBIT 1</u>**

The New York Times

June 4, 2013

# Make Patent Trolls Pay in Court
By RANDALL R. RADER, COLLEEN V. CHIEN and DAVID HRICIK

FROM an early age we are taught the importance of fighting fairly. But as the vast number of frivolous patent lawsuits have shown, too many people are rewarded for doing just the opposite.

The onslaught of litigation brought by "patent trolls" — who typically buy up a slew of patents, then sue anyone and everyone who might be using or selling the claimed inventions — has slowed the development of new products, increased costs for businesses and consumers, and clogged our judicial system.

Their business plan is simple: trolls (intellectual-property lawyers use less evocative terms like "non-practicing entities" and "patent-assertion entities") make money by threatening companies with expensive lawsuits and then using that cudgel, rather than the merits of a case, to extract a financial settlement. In the apt summary of President Obama, who on Tuesday announced a plan to stave off frivolous patent litigation, trolls just want to "hijack somebody else's idea and see if they can extort some money."

So far, legislative action against the practice has been meager. In May, Gov. Peter Shumlin, Democrat of Vermont, signed legislation — the first of its kind — that amends the state's consumer protection laws to empower its attorney general and others to sue patent holders who assert infringement claims against a Vermont business or resident in bad faith. But lawmakers in the remaining 49 states and in Congress, where no less than four bills now sit in various committees, have yet to legislate specifically against patent trolling.

Mr. Obama's latest proposals echo those in several bills, including making it harder for patent litigants to set up shell companies to hide their activities.

In the meantime, vexatious patent litigation continues to grind through our already crowded courts, costing defendants and taxpayers tens of billions of dollars each year and delaying justice for those who legitimately need a fair hearing of their claims. Trolls, in fact, filed the majority of the roughly 4,700 patent suits in 2012 — and many of those were against small companies and start-ups that often can't afford to fight back.

The problem stems largely from the fact that, in our judicial system, trolls have an important strategic advantage over their adversaries: they don't make anything. So in a patent lawsuit, they have far fewer documents to produce, fewer witnesses and a much smaller legal bill than a

company that does make and sell something.

Because they don't manufacture products, they need not fear a counterclaim for infringing some other patent. They need not be concerned with reputation in the marketplace or with their employees being distracted from business, since litigation is their business.

Trolls, moreover, often use lawyers to represent them on a contingent-fee basis (lawyers get paid only when they win), allowing trolls to defer significant legal costs that manufacturers, who generally must pay high hourly fees, cannot.

With huge advantages in cost and risk, trolls can afford to file patent-infringement lawsuits that have just a slim chance of success. When they lose a case, after all, they are typically out little more than their own court-filing fees. Defendants, on the other hand, have much more to lose from a protracted legal fight and so they often end up settling.

Lost in the debate, however, is that judges already have the authority to curtail these practices: they can make trolls pay for abusive litigation.

Section 285 of the Patent Act, as well as Rule 11 of the Federal Rules of Civil Procedure, give judges the authority they need to shift the cost burden of litigation abuse from the defendant to the troll. But remarkably, judges don't do so very often: by our count, fees were shifted under Section 285 in only 20 out of nearly 3,000 patent cases filed in 2011.

Our judicial system's bias against shifting fees partly explains that reluctance, but Section 285 is flexible enough to help defend against trolls. And even though many cases settle, the prospect of paying fees will discourage aggressive suits and frivolous demands.

To make sure Section 285 is implemented with appropriate vigor, judges must look more closely for signs that a patent lawsuit was pursued primarily to take improper advantage of a defendant — that is, using the threat of litigation cost, rather than the merits of a claim, to bully a defendant into settling.

One sign of potential abuse is when a single patent holder sues hundreds or thousands of users of a technology (who know little about the patent) rather than those who make it — or when a patent holder sues a slew of companies with a demand for a quick settlement at a fraction of the cost of defense, or refuses to stop pursuing settlements from product users even after a court has ruled against the patentee.

Other indications of potential bullying include litigants who assert a patent claim when the rights to it have already been granted through license, or distort a patent claim far beyond its plain meaning and precedent for the apparent purpose of raising the legal costs of the defense.

Judges know the routine all too well, and the law gives them the authority to stop it. We urge them to do so.

*Randall R. Rader is chief judge of the United States Court of Appeals for the Federal Circuit. Colleen V. Chien is an assistant professor of law at Santa Clara University. David Hricik is a professor of law at Mercer University.*

# **EXHIBIT 2**

# Annual Report
# of the
# United States District Court
# for the
# District of Delaware
# to the
# Federal Bar Association
# 2013

This Report was produced by the United States District Court
for the District of Delaware
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, Delaware 19801

# PATENT CASE FILINGS

Patent filings continue to be a significant part of the District Court's caseload. The first graph details the annual number of filings during the period from 2003-2012. 809 patent cases were filed in 2012, nearly six times the 135 filed in 2003.

The second graph shows the increase of patent filings as a percentage of total caseload, which grew from 7% in 2003 to 48% in 2012.

For the past decade, Delaware has ranked in the top six district courts for patent filings in the nation. The third graph compares the results of these trends from 2003 to 2012 on a national level. During those years, Delaware averaged 65 patent cases filed per authorized judgeship. In more recent years patent filings per judgeship have been steadily rising in Delaware, from 47 per authorized judgeship in 2008 to 54 per authorized judgeship in 2009. In 2012, Delaware averaged 202 patent filings per authorized judgeship. That is 52% higher than the next highest patent filings per authorized judgeship in the country.

The increase in patent filings has caused Delaware to have the highest weighted filings per judgeship in the entire country, with an average caseload of 1,165, a 67% increase from the previous year. In 2011, Delaware was ranked 6th with an average caseload of 696, and in 2010, Delaware was ranked 20th in the nation based on its average caseload of 550 cases per authorized judgeship.



U. S. District Court for the District of Delaware, Annual Report — Page 10