IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUMMIT DATA SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 10-749-GMS |
| | ) | |
| EMC CORPORATION, BUFFALO. | ) | **FILED UNDER SEAL** |
| TECHNOLOGY (USA), INC., D-LINK | ) | |
| SYSTEMS, INC., HITACHI DATA | ) | |
| SYSTEMS CORPORATION, NETAPP, | ) | |
| INC., NETGEAR INC., and QNAP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM**

**I.     INTRODUCTION**

Plaintiff Summit Data Systems, LLC ("Summit") brought a patent infringement claim.

against defendant NetApp, Inc. ("NetApp") and eight other defendants alleging infringement of

U.S. Patent Nos. 7,392,291 and 7,428,581 (collectively, "the asserted patents").[1] (D.I. 1.) After

settling its claims and dismissing the other defendants, Summit voluntarily dismissed its

remaining claims against NetApp with prejudice pursuant to Federal Rule of Civil Procedure

41(a)(2). (D.I. 234.) Before the court is NetApp's motion for attorneys' fees and costs pursuant

to 35 U.S.C. § 285. (D.I. 236.) For the following reasons, the court will grant NetApp's motion

and order Summit to pay attorneys' fees and costs.

---

[1] Summit also brought claims against Buffalo Technology, Inc. ("Buffalo"), D-Link Systems, Inc. ("D-Link"), EMC Corporation ("EMC"), Fujitsu America, Inc. ("Fujitsu"), Hitachi Data Systems Corporation ("Hitachi"), Infortrend Corp. ("Infortrend"), Netgear, Inc. ("Netgear"), and Qnap, Inc. ("Qnap"). (D.I. 79.) NetApp is the only remaining defendant in this action.

## II.    BACKGROUND

Acacia Research Group ("Acacia") purchased the asserted patents in February 2010.[2] (D.I. 238, Ex. 6.) Acacia is a publicly traded patent licensing company, commonly referred to as a non-practicing entity. (*Id.* Ex. 5.) Summit is a wholly owned subsidiary of Acacia and now holds title to the asserted patents. (*Id.* Ex. 3 at 13, 66.) According to Summit, its "predecessor-in-interest"—*i.e.*, Acacia—determined that several products on the market practiced one or more claims of the asserted patents. (D.I. 242 at 3.) In particular, Acacia believed that a NetApp server product, when used to form a network with a host computer running a Microsoft operating system, practiced the asserted claims. (D.I. 242 at 3-4.) After acquiring the asserted patents for itself, Summit engaged in a similar analysis and reached the same conclusion. (*Id.* at 4 n.1)

On June 28, 2010, Summit entered into an agreement ("Licensing Agreement") with RPX, a computer industry "patent aggregator" that obtains patent licenses for the benefit of its member companies. (D.I. 237, Ex. 3 at 67; Ex. 8.) By being an RPX member, companies gain access to the large number of patents held or licensed by RPX. ·The Licensing Agreement between Summit and RPX covered the asserted patents and provided licenses to forty-three member companies, including, notably, Microsoft. (*Id.* Ex. 8.) The Licensing Agreement also provided for a "Patent License Option," allowing RPX to exercise an option at a later time to sublicense the patents to specified "Option Companies." (*Id.*) NetApp was one of four named Option Companies. (*Id.*) At no point, however, did RPX exercise the option for NetApp.

On September 1, 2010, Summit filed this action against NetApp and seven other defendants alleging infringement of the asserted patents. (D.I. 1.) The asserted patents, both titled "Architecture for Providing Block-Level Access over a Computer Network," relate to data

---

[2] Although Acacia has held different names, for simplicity, the court will refer to the entity simply as Acacia, as its history does not materially affect the background facts.

storage systems consisting of a host computer connected by a network to a storage server. (D.I. 1; D.I. 237 at 5.)  The innovation claimed in the patents is the concurrent use of multiple logical connections between the host computer and the storage server. (D.I. 237 at 5.)  The accused products are storage servers that operate within the claimed network systems; because the accused products only perform a portion of the claimed system, they cannot practice the asserted claims alone, making this an issue of induced infringement. (*Id.*)  Only an end-user with a host computer practicing all the claimed elements directly infringes.

Shortly after Summit filed suit, Fujitsu and Netgear both avoided litigation by joining the Licensing Agreement, which provided them with a sublicense for the asserted patents. (D.I. 66; D.I. 134; D.I. 288.)  After claim construction proceedings, Summit negotiated settlements with the remaining defendants.  Summit dismissed Hitachi for $60,000 (D.I. 238, Ex. 12), D-Link for $170,000 (*Id.* Ex. 13), and Buffalo for $150,000 (*Id.* Ex. 14.)  After fact discovery, Summit dismissed Infortrend for $125,000 (*Id.* Ex. 15) and Qnap for $75,000 (*Id.* Ex. 16.)

On April 2, 2012, Summit for the first time disclosed the existence of the Licensing Agreement through discovery. (D.I. 242 at 5.)  On October 5, 2012, NetApp informed Summit that the Licensing Agreement, according to its plain terms, licensed the asserted patents to Microsoft. (D.I. 238, Ex. 20.)  As such, "no product sold by NetApp can be used in an infringing manner when the end user employs Microsoft's initiator software." (*Id.*)  On October 10, 2012, Summit conceded that the Licensing Agreement precluded NetApp's infringement liability for products employing the Microsoft software: "We concur in your interpretation of the license agreement . . . ." (*Id.* Ex. 9.)

On November 9, 2012, Summit dismissed its claims against EMC with prejudice on the condition that EMC would not seek attorney's fees. (D.I. 222.)  Summit also moved to dismiss

NetApp with prejudice "with each party to bear its own costs and attorneys' fees." (D.I. 228.) NetApp objected to Summit's motion, wishing to seek attorneys' fees under 35 U.S.C. § 285. The court subsequently granted Summit's motion to dismiss its claims against NetApp with prejudice and allowed NetApp to seek attorneys' fees. (D.I. 234.) NetApp then filed the present motion for attorneys' fees on January 29, 2013. (D.I. 236.)

## III.    STANDARD OF REVIEW

Section 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The Supreme Court recently commented on § 285 and loosened the preexisting standard for what makes a case "exceptional." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014). Under the previous standard outlined by the Federal Circuit, exceptionality could only be established in "two limited circumstances: 'when there has been some material inappropriate conduct,' or when the litigation is both 'brought in subjective bad faith' and 'objectively baseless.'" *Id.* at 1752 (quoting *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (2005)). The prevailing party also had to prove exceptionality by clear and convincing evidence. *Brooks Furniture*, 393 F.3d at 1382. In *Octane Fitness*, however, the Court rejected the Federal Circuit's "rigid" approach, stating that it "impermissibly encumbers the statutory grant of discretion to district courts." [3] *Octane Fitness*, 134 S. Ct. at 1755.

In place of the strict formulation laid out by the Federal Circuit in *Brooks Furniture*, the Supreme Court imposed a rule offering broad discretion to district courts:

---

[3] The parties' briefing was submitted prior the Supreme Court's ruling in *Octane Fitness*, and they therefore apply the old *Brooks Furniture* standard. The court applies the new rule but notes that NetApp likely would have succeeded in its motion under the more restrictive approach as well.

> We hold, then, that an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Id.* at 1756.

The Court drew from a copyright case to present a non-exclusive list of factors for the district courts to consider, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 1756 n.6 (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994)). "[A] case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.* at 1757.

The Supreme Court also rejected the *Brooks Furniture* "clear and convincing evidence" burden. *Id.* at 1758. "[N]othing in § 285 justifies such a high standard of proof. Section 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less such a high one. Indeed, patent-infringement litigation has always been governed by a preponderance of the evidence standard . . . ." *Id.*

## IV.   DISCUSSION

The parties do not dispute that NetApp is a prevailing party as required by § 285. The award of attorneys' fees therefore turns on whether this case is exceptional. In light of the totality of the circumstances, the court finds that it is exceptional. *See id.* at 1756.

From the outset, Summit rested its entire theory of infringement on the premise that NetApp products, when used in conjunction with Microsoft initiator software, infringed the asserted patents. Indeed, one of Acacia's motivations for acquiring the asserted patents in the

first place appears to have been its belief that NetApp's product practiced the asserted claims. (D.I. 242 at 3–4.) Throughout litigation, Summit has never been able to identify an alternative theory of infringement that did not require NetApp's products interacting with Microsoft software. (D.I. 238, Ex. 23 at 109–10).

Summit forfeited its right to pursue this theory of infringement against NetApp when it entered into the Licensing Agreement with RPX, which provided Microsoft with a license to the asserted patents. With Microsoft holding a license, direct infringement by a host computer running Microsoft's initiator software was impossible. Consequently, there could be no induced infringement claim against NetApp in this system. *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014) ("[W]here there has been no direct infringement, there can be no inducement of infringement under § 271(b).")

Nonetheless, Summit brought suit against NetApp barely two months after executing the Licensing Agreement, despite having no other evidence that NetApp's product could infringe the asserted patents in a system not running the Microsoft software. It then took Summit eighteen months to disclose the existence of the Licensing Agreement to NetApp. Throughout this entire time, Summit was still pursuing its theory of infringement against NetApp for a system employing the Microsoft software. Yet, Summit's expert testified that he was unable to determine whether NetApp products in systems running Linux or UNIX, instead of Microsoft, would infringe the asserted patents because he "didn't have time." (D.I. 238, Ex. 23 at 109–10.)

These facts alone (notwithstanding additional contentions NetApp puts forth)[4] support a finding that the case "stands out from others" and is exceptional under § 285. *See Octane Fitness*, 134 S. Ct. at 1756. Summit defends against this label on several grounds. First, Summit

---

[4] NetApp argues that Summit's infringement position was untenable in light of the stipulated claim construction and also that Summit failed to allege scienter as required for induced infringement claims. (D.I. 237 at 13–15.) The court finds it unnecessary to address whether these alleged flaws in Summit's case make it exceptional.

argues the Licensing Agreement was "facially ambiguous" because NetApp was named as an Option Company, eligible for a sublicense. (D.I. 242 at 7–8.) The court dismisses this argument. Summit did not appear to find the License Agreement ambiguous when it readily concurred in its email that "no product sold by NetApp can be used in an infringing manner when the end user employs Microsoft's initiator software." (D.I. 238, Ex. 9.) Moreover, Summit and Acacia are in the business of patent licensing. At best, their argument states they were careless in reading their own multi-million dollar License Agreement before embarking on a lawsuit spanning several years and costing the parties and the court countless resources.

Summit's remaining contentions can be addressed together. Summit argues that license and patent exhaustion are affirmative defenses that NetApp had the burden of proving. (D.I. 242 at 12.) Moreover, Summit argues that, given the market size, it would be "reasonable to assume" that NetApp infringes the asserted patents in some other configuration with a non-RPX member. (D.I. 242 at 11–13; D.I. 238, Ex. 21 at 7.) Although Summit states the correct rule of law, these arguments miss the point. From the moment it licensed the asserted patents to RPX and Microsoft, Summit had no basis for alleging infringement against NetApp. For over two years, Summit nonetheless proceeded on an infringement theory that rested on Microsoft's software being a necessary component. Summit cannot rely on reasonable assumptions and guesses that NetApp infringes the asserted patents in one way or another. And NetApp need not establish an affirmative defense when Summit's sole theory of infringement was unfounded.

Finally, the court finds Summit's practice of extracting settlements worth a fraction of what the case would cost to litigate supports a finding of exceptionality. No settlement with any of the other defendants was for more than $175,000. (D.I. 238, Exs. 12–16.) In EMC's case, Summit cut its losses and dismissed all claims with prejudice in exchange for EMC's release of

its statutory right to seek attorney's fees. The Federal Circuit has looked to "nuisance value settlements" to determine whether a case is exceptional.[5] *See Eon-Net LP v. Flagstar Bancorp*, 653 F.2d 1314, 1327–28 (Fed. Cir. 2011). In *Eon-Net*, the Federal Circuit upheld the district court's determination that a case was exceptional where a non-practicing entity plaintiff sought to extract nuisance value settlements from numerous defendants, for values less than ten percent what it would cost the defendants to litigate. *Id.* The Federal Circuit focused on the high costs for defendants to defend, the burden of complying with discovery, and the minimal risk to non-practicing entities because they have no actual products at stake. *Id.*

The court finds the reasoning in *Eon-Net* applicable here. Although Summit contends that its settlements were calculated according to the value of accused product sales, the court in *Eon-Net* faced a similar settlement payment schedule and found the focus is still on the relative costs to litigate. *Id.* Non-practicing entities like Summit and Acacia are entitled to enforce their patent rights through litigation and seek settlements and licenses. "But the appetite for licensing revenue cannot overpower a litigant's and its counsel's obligation to file cases reasonably based in law and fact and to litigate those cases in good faith." *Id.* at 1328.

The facts of this case demonstrate that Summit pursued an action against NetApp without any basis for infringement, delayed disclosing the existence of the Licensing Agreement for eighteen months, extracted settlements from co-defendants worth a fraction of what it would actually cost them to defend the lawsuit, and then voluntarily dismissed its claims with prejudice prior to the court issuing a ruling on the merits.[6] Even assuming that Summit was not acting deceptively—"double dipping" as NetApp contends—the court still finds that the factors noted

---

[5] "Subjective bad faith" and the "unreasonable manner in which the case was litigated" are both relevant factors under *Octane Fitness*, as they were under *Brooks Furniture*. *See Octane Fitness*, 134 S. Ct. at 1756 & n.6.

[6] Of course plaintiffs are free to perform their own cost-benefit analyses, and Summit's decision to voluntarily dismiss its case prior to summary judgment does not, alone, make the case exceptional. When taken together with the additional circumstances, however, Summit's conduct appears much less defensible.

in *Octane Fitness* point toward this being an exceptional case. *See Octane Fitness*, 134 S. Ct. at 1756 & n.6. The claims were frivolous—Microsoft's initiator software licensed, so no system employing it could infringe the asserted patents. Summit's motivation was to extract quick settlements that were dwarfed by the costs to litigate. Summit was objectively unreasonable in bringing a lawsuit against NetApp mere months after executing the Licensing Agreement that effectively eliminated its theory of infringement. Finally, the court is convinced that an award of attorneys' fees in this case is necessary to deter this sort of reckless and wasteful litigation in the future.

In light of the totality of the circumstances, the court finds this case to be exceptional and exercises its discretion to award attorneys' fees in favor of NetApp, pursuant to 35 U.S.C. § 285. Summit has not challenged NetApp's calculation of fees, amounting to $1,395,514.62 plus any additional expenses incurred in filing the present motion.

## V.    CONCLUSION

The totality of the circumstances supports the determination that this case is exceptional. Pursuant to 35 U.S.C. § 285, the court grants NetApp's motion for attorneys' fees and cost and orders Summit to pay $1,395,514.62 plus any additional expenses incurred in filing this motion.

Dated: September 25, 2014

UNITED STATES DISTRICT JUDGE

9